**Slip Op. 01-65**

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| BETHLEHEM STEEL CORPORATION, U.S. STEEL GROUP, A UNIT OF USX CORPORATION, ISPAT INLAND INC., LTV STEEL COMPANY, INC. and NATIONAL STEEL CORPORATION, | : <br> : <br> : <br> : |
| *Plaintiffs,* | : |
| v. | : |
| UNITED STATES, | :    Court No. 99-08-00524 |
| *Defendant,* | : |
| and | : |
| USINAS SIDERÚRGICAS DE MINAS GERAIS S/A, COMPANHIA SIDERÚRGICA PAULISTA and COMPANHIA SIDERÚRGICA NACIONAL, | : <br> : <br> : |
| *Defendant-Intervenors.* | : |

[Determination of U.S. Department of Commerce's International Trade Administration on antidumping duty suspension agreement remanded for action consistent with this opinion.]

Decided: May 29, 2001

Dewey Ballantine LLP (Alan Wm. Wolff, Michael H. Stein, and Michael Castellano) and Skadden, Arps, Slate, Meagher & Flom LLP (Robert E. Lighthizer, John J. Mangan and Worth S. Anderson), for Plaintiffs.

Stuart E. Schiffer, Acting Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice; Lucius B. Lau, Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice; Rina Goldenberg and David R. Mason, Attorneys, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, Of Counsel; for Defendant.

Willkie Farr & Gallagher (Christopher Dunn, Robert L. LaFrankie, and Karl von Schriltz), for Defendant-Intervenors.

**OPINION**

RIDGWAY, Judge:

This action challenges a July 1999 agreement between the U.S. Department of Commerce ("Commerce") and three Brazilian steel exporters ("Brazilian Exporters"),[1] suspending at the eleventh hour the investigation into the alleged dumping in the United States of certain steel products from Brazil. *See* Hot-Rolled Flat-Rolled Carbon-Quality Steel Products from Brazil, 64 Fed. Reg. 38,792 (Dep't Commerce 1999) (suspension of antidumping investigation and entry of suspension agreement) (Public Administrative Record Document ("P.R. Doc.") No. 295) ("Notice of Suspension" or "Agreement").[2] That investigation was initiated at the behest of, among others, the plaintiff domestic steel producers here ("Domestic Producers").[3] *See* Certain Hot-Rolled Flat-Rolled Carbon-Quality Steel Products From Brazil, Japan, and the Russian Federation, 63 Fed. Reg. 56,607

---

[1]The three Brazilian exporters who are parties to the challenged agreement – Usinas Siderurgicas de Minas Gerais S/A ("USIMINAS"), Companhia Siderurgica Paulista ("COSIPA"), and Companhia Siderurgica Nacional ("CSN") – were among the respondents in the underlying antidumping investigation, and are Defendant-Intervenors in this action.

[2]Adopting the convention used in the parties' briefs, citations to the Public Administrative Record are designated "P.R. Doc. No." followed by the number of the particular record as indicated under the handwritten "Doc. #" column in the administrative record which the Department of Commerce filed with the Court.

[3]Plaintiffs are Bethlehem Steel Corporation; U.S. Steel Group, a unit of USX Corporation; Ispat Inland Inc.; LTV Steel Company, Inc.; and National Steel Corporation. Plaintiffs constitute roughly half of the industry overall, and well over half of the industry that participated in the underlying investigation. *See* Antidumping Duty Petition: Certain Hot-Rolled, Carbon Steel Flat Products from Brazil (Sept. 30, 1998) (Non-Public Administrative Record Document No. 1).

(Dep't Commerce 1998) (initiation of antidumping investigations). The Domestic Producers

contend that the July 1999 Suspension Agreement is the product of a high stakes "bait and switch"

maneuver (Tr. at 26),[4] and that the Agreement is unlawful.

As the Domestic Producers have observed, a suspension agreement is essentially a unique

form of settlement agreement: a settlement agreement to which the complainant – that is, the

domestic industry – is not a signatory. Tr. at 4; *see also* 125 Cong. Rec. 20,168 (1979).[5] While

Congress has authorized Commerce to enter into suspension agreements, Congress has emphasized

the limited circumstances in which such agreements are appropriate, and has established rigorous

procedural safeguards to ensure that they are not abused to the detriment of domestic interests.[6]

The law on suspension agreements requires, among other things, that Commerce afford the

domestic industry the opportunity to review and comment on any proposed agreement. 19 U.S.C.

§ 1673c(e)(1994). But the Domestic Producers note that the Proposed Agreement that Commerce

proffered for review and comment in this case was materially different from the final Suspension

Agreement that Commerce executed. *See* Proposed Agreement Suspending the Antidumping

Investigation on Hot-Rolled Flat-Rolled Carbon-Quality Steel from Brazil (June 6, 1999) (P.R. Doc.

No. 267) ("Proposed Agreement").

---

[4]Transcript of oral argument on Plaintiffs' Motion for Judgment on the Agency Record (cited as "Tr. at ___").

[5]In a colloquy immediately preceding the Senate vote on the Trade Agreements Act of 1979, Senator Heinz observed: "When the committee discussed this concept [of suspension agreements] there was some suggestion that it was analogous to settling a case out of court . . . In fact there is a major difference. In a suit any settlement is between plaintiff and defendant. In this bill any settlement is effectively between defendant and judge, a very different relationship, especially when the judge is not always neutral." 125 Cong. Rec. 20,168 (1979).

[6]*See* section I.A, *infra*.

The Domestic Producers argue that Commerce's "bait and switch" of agreements failed to satisfy its notice, comment and consultation obligations under the applicable law. The Domestic Producers further assert that, under the facts of this case, Commerce cannot make the substantive determinations required to justify the Suspension Agreement.[7]

Pending before the Court is Plaintiffs' Motion for Judgment on the Agency Record (filed under USCIT Rule 56.2), in which the Domestic Producers request that the Court declare the Suspension Agreement null and void, and instruct Commerce to enter an antidumping duty order on the subject merchandise. Plaintiffs' motion is opposed by Defendant, the United States ("the Government"), as well as the Brazilian Exporters, who argue that Commerce's determination to suspend the antidumping investigation should be sustained in all respects.[8]

Plaintiff's motion is granted in part. For the reasons discussed below, this case is remanded to the Department of Commerce to enable it to comply with the notice, comment and consultation requirements of the statute (19 U.S.C. § 1673c(e) ), to enable it to articulate a legal standard for making its public interest determination or otherwise explain the connection between the facts found and the choice made pursuant to the statute (19 U.S.C. § 1673c(d)(1)), and – if appropriate (*i.e.*, in the case of a subsection (c) agreement, which requires a finding by Commerce that the investigation

---

[7]Specifically, the Domestic Producers contend that the Agreement does not comply with the 15% limitation on dumping required of subsection (c) agreements; that effective monitoring of the Agreement is not practicable; that there are no "extraordinary circumstances" in this case (*i.e.*, that the Agreement was not more beneficial to the domestic industry than continuation of the investigation, and that the investigation was not complex); that the Agreement is not in the public interest; and that the Agreement does not prevent the suppression or undercutting of domestic prices.

[8]Two companion cases are also pending before the Court – Court No. 99-08-00525, in which the Domestic Producers challenge the suspension agreement in a parallel countervailing duty investigation; and Court No. 99-08-00528, in which the Brazilian Exporters challenge Commerce's final affirmative countervailing duty determination.

is "complex") – to enable it to interpret the phrase "large number" of transactions or adjustments in the context of the "extraordinary circumstances" requirement of the statute (19 U.S.C. § 1673c(c)(2)(B)(i)).

## I. **Background**

### A. The Suspension Agreement Statute

The statutory provisions authorizing suspension agreements in antidumping duty cases were added to the Tariff Act of 1930 as part of the Trade Agreements Act of 1979 ("the Act"), as a means of limiting the Government's discretion to suspend investigations. Although there was no specific statutory authorization for doing so, it was the practice of the Secretary of the Treasury – prior to the Act – to discontinue antidumping duty investigations at any time if it was determined that (1) possible margins of dumping were minimal relative to export volume, price revisions had been made to eliminate any likelihood of less than fair value ("LTFV") sales, and there were assurances that there would be no LTFV sales in the future; (2) sales to the United States had terminated and there were assurances that they would not resume; or (3) there were other circumstances making it inappropriate to continue the investigation. H. Rep. No. 96-317 at 67; *see also* S. Rep. No. 96-249 at 67, *reprinted in* 1979 U.S.C.C.A.N. 381 at 453 (1979) (briefly summarizing Treasury Department practice at the time). *See generally* Letter from Dewey Ballantine to Clerk of Court of International Trade (March 9, 2001) at 1 (summarizing use of suspension agreements prior to Trade Agreements Act).

The suspension agreement provisions were adopted to impose "strict limits on discontinuing or suspending investigations pursuant to deals with foreign governments or producers." 125 Cong.

Rec. 20,163 (1979).[9]  The provisions were intended to make "major changes in . . . [the then-existing] law and practice concerning the suspension of an investigation based on exporter agreements" by, *inter alia*, replacing certain general, subjective criteria then in use (*e.g.*, "minimal" dumping margins) with "specific criteria and requirements"; eliminating the Secretary's "unfettered discretion" to terminate investigations; and "improv[ing] the procedural safeguards . . . by providing increased participation by the petitioner."  H. Rep. No. 96-317 at 63, 67.

With the Trade Agreements Act, Congress expressly authorized Commerce to suspend an antidumping duty investigation in certain circumstances where foreign exporters of the merchandise agree to take remedial action.  19 U.S.C. §§ 1673c(b)-(m) (1994).  In doing so, Congress recognized the potential advantages of suspension agreements, as a "means of achieving the remedial purposes of the [antidumping] law in as short a time as possible and with a minimum expenditure of resources by all parties involved."  H. Rep. No. 96-317 at 63.  *Accord*, S. Rep. No. 96-249 at 71 (suspension agreements "permit rapid and pragmatic resolutions of antidumping duty cases").[10]

_____

[9]Legislative history is particularly instructive where, as here, Congress considered the statute at issue as "fast track" legislation.  As a general rule, the "plain meaning" doctrine of statutory construction and its corollaries constrain resort to extrinsic aids (such as committee reports and remarks during floor debates), on the theory that the language of the statute as adopted expresses all that Congress intended to say on the subject (though – even then – a widely accepted exception to the doctrine allows recourse to extrinsic aids to confirm or elucidate a statute's language).  *See* 2A Norman J. Singer, Sutherland on Statutes and Statutory Construction §§ 46:03, 48:01 (6th ed. 2000).  But that logic has little force where "fast track" legislation is concerned.  "Fast track" is a procedural device (now known as "trade promotion authority") which shields trade legislation from amendment once the bill has been formally introduced in Congress.  Because legislators are precluded from amending the language of a "fast track" statute to clarify and amplify its meaning, its legislative history is entitled to special weight.

[10]*See also* H. Rep. No. 96-317 at 65 (advantages of suspension agreements under 19 U.S.C. §1673c(c) include "the expenses saved because of prompt settlement of a case"); Statements of Administrative Action for Trade Agreements Act of 1979, H.R. Doc. No. 96-153, Part II at 420, *reprinted in* 1979 U.S.C.C.A.N. 665 at 689 (suspension agreements under 19 U.S.C. § 1673c(c) have

But Congress was equally mindful of the potential for abuse of suspension agreements. To ensure that such agreements are not entered into to the disadvantage of a petitioning domestic industry (for foreign policy or other political reasons), the statute is replete with stringent requirements that must be met before an agreement can be concluded. Congress emphasized that "the authority to suspend investigations [is to] be exercised within the carefully circumscribed limits" set forth in the law. H. Rep. 96-317 at 63; *see also* S. Rep. No. 96-249 at 71 (to ensure that suspension agreements are used only in those cases where they "serve[ ] the interest of the public and the domestic industry affected," agency authority to suspend investigations is "narrowly circumscribed"); 125 Cong. Rec. 20,168-69 (Senator Heinz's understanding that suspension agreements permitted only "under certain narrowly constrained circumstances" confirmed by bill managers Senators Ribicoff and Roth). Congress further cautioned that "suspension is an unusual action which should not become the normal means for disposing of [antidumping] cases." S. Rep. No. 96-249 at 71.

There are two distinct types of suspension agreements, both of which are relevant here – so-called "subsection (b) agreements" and "subsection (c) agreements."[11] Subsection (b) agreements eliminate all sales at less than fair value. Under such agreements, exporters must agree either to cease all exports, or to revise their prices to eliminate completely LTFV sales. 19 U.S.C. § 1673c(b).

---

"the value of settling the case quickly. . .").

[11]Suspension agreements with non-market economy producers are governed by 19 U.S.C. § 1673c(1) (1994), and must (1) be in the public interest, (2) be susceptible to effective monitoring, and (3) prevent suppression or undercutting of price levels. Such an agreement was the subject of U.S. Steel v. United States, ____ CIT ____, 123 F. Supp.2d 1365 (2000).

In contrast, subsection (c) agreements do not completely eliminate dumping; rather, they eliminate only its injurious effect. 19 U.S.C. § 1673c(c).

Prior to accepting either a subsection (b) or (c) agreement, Commerce must find both that "suspension of the investigation is in the public interest," and that "effective monitoring of the agreement by the United States is practicable." 19 U.S.C. § 1673c(d). Commerce is also required to notify petitioners of, and consult with them concerning, its intention to suspend the investigation. In addition, Commerce must provide petitioners with a copy of the proposed agreement, and accord them an opportunity to comment. 19 U.S.C. § 1673c(e).

But there are additional requirements for subsection (c) agreements. Because such agreements, by definition, may permit exporters to continue to engage in a certain amount of dumping, Congress restricted subsection (c) agreements to cases involving "extraordinary circumstances" – cases where the suspension of the investigation is more beneficial to the domestic industry than its continuation, and where the investigation is "complex." *See* S. Rep. No. 96-249 at 68 (discussing the extraordinary circumstances requirement set out in 19 U.S.C. § 1673c(c)(2)). Moreover, subsection (c) agreements must limit the margin by which normal value exceeds the export price, and prevent the suppression or undercutting of price levels of domestic products by imports. 19 U.S.C. § 1673(c)(1).

As Congress intended, Commerce has invoked the suspension agreement provisions of the trade laws relatively infrequently – at least until recently. Notably, prior to the suspension of the investigation at issue here, Commerce had accepted only two other subsection (c) agreements in antidumping cases. *See* Potassium Chloride from Canada, 53 Fed. Reg. 1393 (Dep't Commerce 1988) (suspension of antidumping investigation and entry of suspension agreement); Fresh Tomatoes

from Mexico, 61 Fed. Reg. 56618 (Dep't Commerce 1996) (suspension of antidumping investigation

and entry of agreement).


B.  The Facts of This Case

On September 30, 1998, the Domestic Producers who are plaintiffs here  –  among others[12]

– petitioned Commerce and the International Trade Commission ("ITC"), seeking the imposition

of antidumping duties on certain steel products from Brazil.  *See* Letter from

Dewey/Schagrin/Skadden to Commerce and ITC, *and* enclosed Petition (Sept. 30, 1998) (P.R. Doc.

No. 1).  That same day, the same petitioners  filed a parallel petition, seeking the imposition of

countervailing duties on the same products.  *See* Certain Hot-Rolled Flat-Rolled Carbon-Quality

Steel Products from Brazil, 63 Fed. Reg. 56,623 (Dep't Commerce 1998) (initiation of

countervailing duty investigation) (referring to petition); Certain Hot-Rolled Steel Products From

Brazil, Japan, and Russia, 63 Fed. Reg. 53,926 (ITC 1998) (institution of countervailing duty and

antidumping investigations) (referring to petition).

Both the antidumping and countervailing duty petitions were accepted, and the requested

investigations were initiated on October 15, 1998.  *See* Certain Hot-Rolled Flat-Rolled Carbon-

Quality Steel Products From Brazil, Japan, and the Russian Federation, 63 Fed. Reg. 56,607 (Dep't

Commerce 1998) (initiation of antidumping investigations); Certain Hot-Rolled Flat-Rolled Carbon-

Quality Steel Products From Brazil, 63 Fed. Reg. 56,623 (Dep't Commerce 1998) (initiation of

countervailing duty investigation).

---

[12]The original petitioners also included California Steel Industries, Gallatin Steel Company, Geneva Steel, Gulf States Steel Inc., IPSCO Steel Inc., Steel Dynamics, Weirton Steel Corporation, the Independent Steelworkers Union, and the United Steelworkers of America.

One month later, the ITC notified Commerce of its preliminary determination, finding in both investigations that "there [was] a reasonable indication that an industry in the United States [was] threatened with material injury by reason of imports" of the Brazilian steel. *See* Certain Hot-Rolled Steel Products From Brazil, Japan, and Russia, 63 Fed. Reg. 65,221 (ITC 1998) (preliminary injury determinations in antidumping and countervailing duty investigations).

On February 12, 1999, Commerce made its preliminary determination in the antidumping duty investigation, finding that the Brazilian steel was being, or was likely to be, sold in the United States at less than fair value. *See* Hot-Rolled Flat-Rolled Carbon-Quality Steel Products from Brazil, 64 Fed. Reg. 8,299 (Dep't Commerce 1999) (P.R. Doc. No. 184). Simultaneously, in the countervailing duty investigation, Commerce made a preliminary determination that countervailable subsidies were being provided to the Brazilian Exporters. *See* Certain Hot-Rolled Flat-Rolled Carbon-Quality Steel Products From Brazil, 64 Fed. Reg. 8,313 (Dep't Commerce 1999) (preliminary determination of sales at LTFV).

On June 6, 1999, literally one month to the day before the deadline for its final determinations, Commerce sent the Domestic Producers (among others) initialed proposed agreements to suspend both the antidumping and countervailing duty investigations, and requested their comments by June 28, 1999. The proposed agreement in the antidumping investigation – the investigation directly at issue in this case – was a subsection (b) agreement. *See* Letters from Commerce to Interested Parties (June 6, 1999) (P.R. Doc. No. 267) (requesting comments on enclosed Proposed Agreement).

The Domestic Producers filed timely comments, detailing their many objections to the proposed suspension agreements. *See* Letter from Dewey/Skadden/Schagrin to Commerce (June 28,

1999) (P.R. Doc. No. 270); Certain Hot-Rolled Flat-Rolled Carbon-Quality Steel Products From Brazil, 64 Fed. Reg. 38,797 (Dep't Commerce 1999) (suspension of countervailing duty investigation and entry of suspension agreement) (acknowledging petitioners' comments on proposed suspension agreement in countervailing duty case).

Nevertheless, on July 6, 1999, the deadline for its final determinations in both the antidumping and countervailing duty investigations, Commerce entered into final agreements suspending those investigations. *See* Hot-Rolled Flat-Rolled Carbon-Quality Steel Products From Brazil, 64 Fed. Reg. 38,792 (Dep't Commerce 1999) (suspension of antidumping investigation and entry of suspension agreement); Certain Hot-Rolled Flat-Rolled Carbon-Quality Steel Products from Brazil, 64 Fed. Reg. 38,797 (Dep't Commerce 1999) (suspension of countervailing duty investigation and entry of suspension agreement).

The final suspension agreement in the antidumping duty investigation was based *not* on subsection (b), but on subsection (c).[13]  That final agreement thus permits a certain amount of continued dumping – in contrast to the proposed agreement, which would have either required the complete elimination of dumping, or cut off exports altogether.  In short, not only were the suspension agreements in general an eleventh hour development; there was also a last minute substitution of a different type of suspension agreement in the antidumping duty case.

Under the terms of the final agreement suspending the antidumping duty investigation (the agreement at issue here), the Brazilian Exporters are prohibited from exporting the steel at issue to

---

[13]In the course of oral argument, counsel for Plaintiffs advised that the Assistant Secretary of Commerce called him on July 5, 1999 to inquire whether his clients would consent to a subsection (c) agreement. Tr. at 8-9.  However, there is no record evidence of that conversation or any other consultation with the Domestic Producers here concerning the subsection (c) agreement. *See* section III.A, *infra*.

the United States for less than the negotiated Reference Price.[14]  Agreement, Part IV, 64 Fed. Reg.

at 38,794.  In addition, the Brazilian Exporters agree to limit dumping to 15% (as required under 19

U.S.C. § 1673c(c)(1)(B)).  Agreement, Part IV, at *id.*

The Agreement obligates the Brazilian Exporters to report certain data concerning U.S. sales,

and includes a "catch-all" requirement that each Brazilian Exporter "supply to [Commerce] 30 days

after the end of each Quarter all information that [Commerce] determines is necessary to ensure that

the [Exporter] is in full compliance with the terms of [the] Agreement."  Agreement, Part V, 64 Fed.

Reg. at 38,794.  The Agreement also authorizes Commerce to share business propriety information

obtained from the Brazilian Exporters with the domestic parties to the underlying antidumping duty

investigation, under appropriate administrative protective orders.  Agreement, Part VI, 64 Fed. Reg.

at 38,794.

The monitoring provisions of the Agreement provide that Commerce is to ensure compliance

with the Agreement by reviewing, *inter alia*, "publicly-available data and other official import data,

including, as appropriate, records maintained by the U.S. Customs Service."  Agreement, Part VII,

64 Fed. Reg. at 38,794.  In addition, Commerce is authorized to require any Brazilian Exporter to

provide documentation to confirm that the price received on any sale was not less than the

established Reference Price.  The Agreement also permits Commerce to obtain from each Brazilian

---

[14]For example, the Reference Price varies product-by-product, and was fixed for the fourth quarter of 1999 at $327/metric ton for the most basic type of untreated hot-rolled steel ("Category One" steel).  Under the Agreement, Reference Prices are adjusted on the last day of each quarter. For Category One steel, the Reference Price must be the higher of the average U.S. market price for that quarter (less six percent), or $327.  The prices for other categories of steel are adjusted accordingly.  Agreement, Part IV, 64 Fed. Reg. at 38,794.  The Agreement precludes the Brazilian Exporters from exporting to the United States any steel products for which Reference Prices have not been established, and sets forth a procedure for including such additional products under the Agreement.  *Id.*

Exporter a report of each sale of steel subject to the Agreement (including each adjustment applicable to each sale). Finally, the Brazilian Exporters consent to permit "review and on-site inspection of all information deemed necessary" by Commerce to verify the reported information. Agreement, Part VII, 64 Fed. Reg. at 38,794.

The Agreement further provides that Commerce may conduct administrative reviews (upon request or at its own initiative), and includes certain provisions designed to ensure that the Agreement is not circumvented. Agreement, Parts VIII, IX, 64 Fed. Reg. at 38,794-95.

In the event of suspected noncompliance or violation of the Agreement, Commerce is authorized to request that the subject Brazilian Exporter provide "all information relating to the allegation, including all sales information pertaining to covered and non-covered merchandise [that the Exporter has] manufactured or sold." Agreement, Part X, 64 Fed. Reg. at 38,795. Any party to the underlying antidumping duty investigation may then submit comments on that information. *Id*. If Commerce determines that the Agreement is being or has been violated or no longer meets the relevant requirements of the suspension agreement statute, the Agreement provides that Commerce "shall take whatever action it deems appropriate" under the relevant provision of the suspension agreement statute (*i.e.*, 19 U.S.C. § 1673c(i) ) and the applicable regulations. Agreement, Part XI, 64 Fed. Reg. at 38,795.[15]

Concurrent with its execution of the suspension agreements in the parallel antidumping duty and countervailing duty proceedings, Commerce separately circulated three decision memoranda

---

[15]Commerce's regulations provide that, in a case such as this, if Commerce finds that the suspension agreement has been violated, it will immediately order suspension of liquidation and issue an antidumping duty order. Commerce must then require immediate posting of estimated duty deposits for all future entries and publish a notice of cancellation of the suspension agreement. *See generally* 19 C.F.R. § 351.209(b) (2000).

setting forth the bases for the determinations supporting its decision to suspend the two investigations. *See* Memoranda from ITA Office of Policy to Ass't Sec. for Import Administration (July 6, 1999) (P.R. Doc. Nos. 281, 282, and 283) (addressing, respectively, the prevention of price suppression and undercutting, the existence of extraordinary circumstances, and the public interest).[16]

That same day, Commerce also issued final affirmative determinations in both the antidumping duty investigation and the countervailing duty investigation. *See* Certain Hot-Rolled Flat-Rolled Carbon-Quality Steel Products From Brazil, 64 Fed. Reg. 38,756 (Dep't Commerce 1999) (final determination of sales at LTFV); Certain Hot-Rolled Flat-Rolled Carbon-Quality Steel Products From Brazil, 64 Fed. Reg. 38,742 (Dep't Commerce 1999) (final affirmative countervailing duty determination). Both investigations were continued, notwithstanding the suspension agreements, pursuant to the request of petitioners in the underlying proceedings. *See* Letter from Skadden/Dewey/Schagrin to Commerce and ITC (July 2, 1999) (P.R. Doc. No. 271) at 1. Commerce found the final dumping margins for CSN, USIMINAS/COSIPA, and all others to be 41.27%, 43.40%, and 42.12%, respectively. Similarly, the net subsidy rates for CSN, USIMINAS/COSIPA, and all others were determined to be 6.35%, 9.67%, and 7.81%, respectively.

The ITC's final determinations – issued August 24, 1999 – confirmed its affirmative preliminary findings on material injury in both the antidumping duty and countervailing duty cases. *See* Certain Hot-Rolled Steel Products From Brazil and Russia, 64 Fed. Reg. 46,951 (ITC 1999) (final injury determinations in antidumping and countervailing duty investigations).

---

[16]The "Extraordinary Circumstances Memo" and the "Public Interest Memo" were issued in support of both suspension agreements; in contrast, the "Price Suppression Memo" relates only to the antidumping suspension agreement.

## II. **Jurisdiction and Standard of Review**

Jurisdiction in this matter is predicated on 28 U.S.C. § 1581(c) (1994). Commerce's decision to suspend the antidumping duty investigation at issue is reviewable pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iv) (1994), and must be sustained unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1994).

"Substantial evidence" is "something less than the weight of the evidence." Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966). Moreover, the possibility of drawing two inconsistent conclusions from the same evidence does not mean that substantial evidence is lacking. *Id*. In other words, Commerce's determination cannot be overturned merely because the plaintiff "is able to produce evidence . . . in support of its own contentions and in opposition to the evidence supporting the agency's determination." Torrington Co. v. United States, 14 CIT 507, 514, 745 F. Supp. 718, 723 (1990) (internal quotation omitted), *aff'd*, 938 F.2d 1276 (Fed. Cir. 1991).

Nevertheless, Commerce's decision must be supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison v. NLRB, 305 U.S. 197, 229 (1938); *accord,* Matsushita Elec. Indus. Co. v. United States, 750 F.2d 927, 933 (Fed. Cir. 1984). Its determination must be supported by the record as a whole, including whatever fairly detracts from the substantiality of the evidence. Tianjin Mach. Imp. & Exp. Corp. v. United States, 16 CIT 1020, 1023 (1992) (*citing* Atlantic Sugar, Ltd. v. United States, 744 F.2d 1556, 1561 (Fed. Cir. 1984) ). Commerce's conclusions must be "reached by 'reasoned decisionmaking,' including an examination of the relevant data and a reasoned explanation supported by a stated

connection between the facts found and the choice made." Electricity Consumers Resource Council v. Federal Energy Regulatory Comm'n, 747 F.2d 1511, 1513 (D.C. Cir. 1984), *citing* Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962).

In determining whether Commerce's interpretation and application of the antidumping statute is "in accordance with law," "[f]irst, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Chevron U.S.A. Inc. v. Natural Resources Defense Council, 467 U.S. 837, 842-43 (1984).

If the statute is silent or ambiguous, the degree of respect accorded an agency's interpretation depends on whether that interpretation is the product of a process that gives it "the force of law" – for example, a formal adjudication or notice-and-comment rulemaking. *See* Christensen v. Harris County, 120 S. Ct. 1655, 1662 (2000). If it is, the court must accord Chevron deference, and uphold any reasonable agency interpretation. *Id*.; *see also* Chevron, 467 U.S. at 842-43.

In contrast, agency "[i]nterpretations . . . in opinion letters – like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law – do not warrant Chevron-style deference." Christensen, 120 S. Ct. at 1662. Agency interpretations which lack the force of law are "entitled to respect . . . but only to the extent that those interpretations have the 'power to persuade'." *Id.* at 1663, *citing* Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944).

### III.  <u>Discussion</u>

#### A.  <u>Notice, Comment and Consultation</u>

The Domestic Producers here argue that Commerce failed to comply with the notice, comment and consultation requirements of the suspension agreement statute because they were denied a meaningful opportunity to submit comments and information for the record prior to the suspension of the antidumping investigation.  In essence, the Domestic Producers contend that affording them an opportunity to comment on a proposed subsection (b) agreement cannot satisfy the notice and comment obligations as to the subsection (c) agreement that Commerce and the Brazilian Exporters executed.  Memorandum of Points and Authorities in Support of Plaintiffs' Rule 56.2 Motion for Judgment Upon the Agency Record ("Plaintiffs' Memo") at 24-26.

The notice, comment and consultation provisions of the statute require that, before entering into a suspension agreement, Commerce must:

> (1) notify the petitioner of, and consult with the petitioner concerning, its intention to suspend the investigation . . . not less than 30 days before the date on which it suspends the investigation.
>
> (2) provide a copy of the proposed agreement to the petitioner . . . together with an explanation of how the agreement will be carried out and enforced, and of how the agreement will meet the requirements of subsections (b) and (d) or (c) and (d) of [the statute], and
>
> (3) permit all interested parties . . . to submit comments and information for the record before the date on which notice of suspension of the investigation is published . . . .

19 U.S.C. § 1673c(e).  The legislative history of the statute highlights the importance of those provisions, emphasizing that "the requirement that the petitioner be consulted will not be met by pro forma communications.  Complete disclosure and discussion is required."  S. Rep. No. 96-249 at 71.

The Government argues that the procedure that Commerce followed complied fully with the letter of the law:  Commerce provided the petitioners below with a copy of the proposed agreement; Commerce afforded the petitioners an opportunity to comment on that proposed agreement; and Commerce responded directly to the petitioners' comments on the proposed agreement – albeit by executing a subsection (c) agreement in place of the subsection (b) agreement that Commerce had proposed.  Defendant's Response in Opposition to Plaintiffs' Motion for Judgment Upon the Agency Record ("Defendant's Memo") at 55-57.  *See also* Defendant-Intervenors' Memorandum of Points and Authorities ("Defendant-Intervenors' Memo") at 42-44 (asserting that "[t]he notice and comment provisions, in short, worked:    they caused the Department to alter the basis of the agreement to accommodate Petitioners' concerns").

The Government maintains that Commerce "is not required to afford interested parties an unlimited opportunity to comment on each modification of the agency's practice or procedure." Defendant's Memo at 57, *citing* British Steel, PLC v. United States, 19 CIT 176, 255, 879 F. Supp. 1254, 1317 (1995), *aff'd in part, rev'd on other grounds*, 174 F.3d 1359 (Fed. Cir. 1999).[17]  True enough.  But, in this case, the Domestic Producers had *no* opportunity to comment on several of the

---

[17]Citing British Steel and invoking the specter of "an unending cycle of notices, comments, and responses," the Government asserts that "the additional procedure advocated by [the Domestic Producers] (whereby Commerce must re-submit agreements for comment whenever re-negotiation occurs) defeats finality."  Defendant's Memo at 57.  But the Government greatly overstates the Domestic Producers' point.  *See* Plaintiffs' Reply Brief ("Reply Memo") at 27 (acknowledging that there is no requirement to consult "on each and every modification to a proposed suspension agreement").  In any event, in a case as clear as this one, there is no need to draw the line as to precisely when a renegotiated agreement must be resubmitted for comment.  Wherever that line might be, in this case it was crossed.  Given the significant differences between the requirements for the two types of agreements, the statute requires that petitioners be afforded notice and an opportunity to comment whenever a subsection (c) agreement is substituted for a proposed subsection (b) agreement.  To hold otherwise would render the notice, comment and consultation requirements an empty formality.

most important aspects of the Agreement that Commerce actually executed – a subsection (c) agreement.

As outlined in section I.A above, the requirements for subsection (b) agreements differ from those for subsection (c) agreements. In addition to the requirements applicable to both (b) and (c) agreements – *i.e.*, the requirements that an agreement be in the public interest and able to be effectively monitored, a subsection (b) agreement requires only that the agreement provide either for the complete cessation of exports of the subject merchandise or the total elimination of dumping. 19 U.S.C. § 1673c(b).

In contrast, because such agreements may permit a limited amount of dumping to continue, the requirements for subsection (c) agreements are more stringent. Specifically, a subsection (c) agreement requires not only the complete elimination of the injurious effects of dumping, the prevention of suppression or undercutting of domestic price levels, and a 15% dumping limitation, but also the presence of "extraordinary circumstances" (which are, in turn, defined as circumstances where the investigation is complex and where suspension of the investigation will be more beneficial to the domestic industry than its continuation). 19 U.S.C. § 1673c(c). Because the proposed agreement offered to the Domestic Producers for comment was a subsection (b) agreement, they had no opportunity to comment on those requirements which are unique to subsection (c) agreements.

Indeed, even as to those requirements which are common to both subsection (b) and (c) agreements – *i.e.*, the §1673c(d) conditions (1) that suspension of the investigation be in the public interest, and (2) that effective monitoring be practicable – a petitioner's analysis might differ, depending on the type of agreement. It is thus impossible to say, even as to those factors, that the Domestic Producers here had adequate notice and opportunity to comment.

Similarly, the statute mandates that Commerce explain to petitioners how a proposed agreement will meet the requirements of either subsections (b) and (d) or subsections (c) and (d), *prior to* suspending an investigation. 19 U.S.C. § 1673c(e). Because the Proposed Agreement here was a subsection (b) agreement, the explanation accompanying it addressed only the requirements of subsections (b) and (d). *See* Letters from Commerce to Interested Parties (June 6, 1999) (P.R. Doc. No. 267) (requesting comments on enclosed Proposed Agreement). Commerce made no attempt to explain to the Domestic Producers how the Agreement would meet the requirements of subsection (c) until *after* it had suspended the investigation. *See* Notice of Suspension, 64 Fed. Reg. at 38,793 (*citing* Extraordinary Circumstances Memo *and* Price Suppression Memo).

Moreover, Commerce's explanation as to how the Proposed Agreement would satisfy the requirements of subsection (d) was rendered moot when Commerce decided to enter into a fundamentally different suspension agreement – the subsection (c) Agreement. Again, Commerce offered its first explanation of the application of subsection (d) to that subsection (c) Agreement only *after* the investigation was suspended. *See* Notice of Suspension, 64 Fed. Reg. at 38,793 (*citing* Price Suppression Memo). In short, Commerce defaulted on its obligation to explain to the Domestic Producers – in advance – how the Agreement meets the applicable requirements of the statute.[18]

---

[18]As discussed above, the statute imposes on Commerce three notice, comment and consultation requirements. In addition to (i) affording petitioners notice of and an opportunity to comment on a proposed suspension agreement and (ii) explaining to petitioners "how the agreement will be carried out and enforced, and . . . how the agreement will meet [the applicable requirements of the statute]," Commerce also must (iii) "consult" with petitioners "concerning [ ] its intention to suspend the investigation." 19 U.S.C. § 1673c(e). The nature, scope and extent of the required consultation is not clear; but, in any event, the Domestic Producers have not separately challenged Commerce's compliance with that requirement here.

In essence, Commerce's actions in this case "stacked the deck." Judicial review is limited to the administrative record; but, here, that record was compiled selectively. Commerce effectively deprived the Domestic Producers of any opportunity for meaningful comment on any agreement which remotely resembled the suspension agreement that Commerce actually signed[19] – and thus limited the very record on which Commerce now seeks to stand.

As a result of Commerce's failure to comply with the notice, comment and consultation requirements of 19 U.S.C. § 1673c(e), the existing record in this matter cannot serve as the basis for a "substantial evidence" review of Commerce's factual findings. Even as to the legal issues presented, the considerations of judicial economy and deference to agency autonomy and expertise that undergird the related doctrines of exhaustion and ripeness counsel remand here.[20]

---

[19]The Government and the Brazilian Exporters emphasize various statements on the record, such as Commerce's assertion that it "consulted extensively with domestic producers and unions, explaining what the agreements will do, how they will work, and how they will be enforced" – statements which they contend must be presumed to be the truth. *See generally* Defendant-Intervenors' Memo at 44-45; Tr. at 49-52, 96-97. But reliance on such conclusory assertions is misplaced where, as here, they are contravened by the record.

The record speaks for itself – and, as discussed above, it is essentially barren of any evidence of consultation concerning a *subsection (c)* agreement. The only record evidence to that effect is a letter from a group of petitioners who did not appear in this forum (*i.e.*, the steel companies identified in footnote 21 above), indicating that "this agreement [apparently the subsection (c) agreement] remedies the problems with the June 6 proposed agreement as addressed in our comments filed on June 26th." *See* Letter from Schagrin Associates to Commerce (July 6, 1999) (P.R. Doc. No. 272). Even if some petitioners below had notice of and an opportunity to comment on the subsection (c) agreement at some point prior to its execution (as the letter seems to suggest), there is no record evidence to indicate that Commerce accorded the Domestic Producers who are plaintiffs here the same opportunity. *See generally* Tr. at 86-87, 94.

[20]There is an inherent irony in relying on the doctrine of exhaustion in cases where, as here, the actions of the agency itself effectively *deprived* parties of the opportunity to avail themselves of their administrative remedies.

Remand will allow all parties to fully exhaust their administrative remedies, and will afford Commerce the opportunity to consider the Domestic Producers' comments, find facts, apply its expertise to the record, and explain the bases for its action. Remand also will protect agency autonomy, and allow Commerce to exercise the discretion granted it by Congress. Finally, by affording Commerce an opportunity to correct any errors it may have made, remand conceivably may obviate entirely the need for further judicial review. *See generally* 2 K. Davis & R. Pierce, Jr., Administrative Law Treatise §§ 15.2 (*citing* McKart v. United States, 395 U.S. 185, 193-95 (1969)), 15.12 (3d ed. 1994).

Accordingly, for the reasons set forth and discussed above, and more fully below, this case must be remanded to allow Commerce to develop a complete record in accordance with the mandates of the statute and to reconsider its action.

## B.  The 15% Dumping Limitation

While the suspension agreement statute expressly contemplates that subsection (c) agreements may permit some dumping to continue, that dumping cannot exceed 15% of the weighted average amount by which the home market price (or cost) exceeded the U.S. market price for the goods.  Specifically, the statute requires that:

> for each entry of each exporter the amount by which the estimated normal value exceeds the export price . . . will not exceed 15 percent of the weighted average amount by which the estimated normal value exceeded the export price . . . for all less-than-fair-value entries of the exporter examination [sic; examined] during the course of the investigation.

19 U.S.C. § 1673c(c)(1)(B).  The Domestic Producers contend that the Agreement fails to comply with the 15% limit because –  to effectively enforce that limitation – Commerce must obtain and

verify information that permits it to determine normal value, so that normal value can be compared

to prices in the United States. However, the Agreement says nothing about the reporting or

systematic collection of Brazilian market price and cost data – the components of normal value.[21]

Plaintiffs' Memo at 9-11; Reply Memo at 7-9, 13-14.

The Brazilian Exporters contend that the Agreement on its face complies with the 15% limit,

emphasizing that it not only invokes, but indeed mirrors, the exact wording of the statute:

> In order to satisfy the requirements of section 734(c)(1)(B) of the Act, each Signatory
> agrees that, for each entry of Hot-Rolled Steel subject to this Agreement, the amount
> by which the estimated normal value exceeds the export price (or the constructed
> export price) will not exceed 15 per cent of the weighted average amount by which
> the estimated normal value exceeded the export price (or the constructed export
> price) for all less-than-fair-value entries of the Signatory examined during the
> investigation.

Agreement, Part IV.E, 64 Fed. Reg. at 38,794. Defendant-Intervenors' Memo at 35. *See also*

Defendant's Memo at 34.

Moreover, while the Government concedes that the Agreement does not specifically provide

for the reporting and collection of Brazilian price and cost data, it points to something that it claims

is even better: a catch-all provision requiring the Brazilian Exporters to provide "all information that

the Department determines is necessary to ensure that [each signatory] is in full compliance."

Defendant's Memo at 28-32 (*citing* Agreement, Part V.A, 64 Fed. Reg. at 38, 794).

The Domestic Producers argue that the catch-all reporting provision is insufficient to satisfy

the statute, because Commerce may never require the Brazilian Exporters to provide the necessary

information. Reply Memo at 9-12. And the Domestic Producers take no comfort in their ability to

---

[21]The Domestic Producers note that the only two mandatory reporting requirements in the
Agreement instead address the collection of data concerning *sales in the United States*. Plaintiffs'
Memo at 10-11 (*citing* Agreement, Part V, 64 Fed. Reg. at 38,794).

enforce the 15% limit by requesting an administrative review, which is – they note – cumbersome and expensive. In any event, they assert, it is the responsibility of Commerce in the first instance to ensure compliance with the 15% limit. Reply Memo at 13. For similar reasons, they contend that it is not enough that the Brazilian Exporters have committed in the Agreement to comply with the 15% limit. According to the Domestic Producers, Commerce's reliance on that commitment amounts to an impermissible delegation of the agency's duty to establish compliance with the mandates of the statute. Reply Memo at 12-13.

The Domestic Producers assert that Commerce does not ordinarily leave compliance with pricing requirements unenforced. Plaintiffs' Memo at 11. Indeed, they note, the Proposed Agreement required that the Brazilian Exporters provide detailed home market information to permit Commerce to satisfy itself that dumping would be eliminated (as required for a subsection (b) agreement). Plaintiffs' Memo at 11; Proposed Agreement, Part V.

The crux of the problem here is that, while the Domestic Producers had notice of and an opportunity to comment on the Proposed Agreement's provisions for reporting and collection of data to verify the elimination of dumping, they had no such notice or opportunity as to the provisions for verifying compliance with the 15% dumping limit, because that limit applies only to subsection (c) agreements.

Although the issue of the 15% limit has now been fully briefed before the Court, the Court is obligated to decide the case on the basis of the administrative record – a record which is presently defective. As discussed in section III.A above, the case must be remanded to Commerce for further proceedings. On remand, assuming that Commerce issues a subsection (c) agreement for comment, the Domestic Producers will have the opportunity to make their case on the 15% limit directly to

Commerce, and Commerce will have the benefit of the Domestic Producers' comments on the administrative record in making its findings.

### C.   The Practicability of Effective Monitoring

The statute permits suspension agreements only where "effective monitoring of the agreement by the United States is practicable."  19 U.S.C. § 1673c(d)(2).  The statute's legislative history underscores the importance of effective monitoring provisions:

> The committee intends that no agreement be accepted unless it can be effectively monitored by the United States.  This will require establishment of procedures under which entries of merchandise covered by an agreement can be reviewed by the authority and by interested parties.  Adequate staff and resources must be allocated for monitoring to insure that relief under the agreement occurs.

S. Rep. No. 96-249 at 71 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 457.

The four relevant monitoring provisions appear in Part VII of the Agreement.  Under the first, Commerce is to monitor entries covered by the agreement utilizing, among other means, official import data and records to determine whether there have been imports that are inconsistent with the agreement.  Second, Commerce is authorized to require  –  and the Brazilian Exporters have agreed to provide – confirmation that the price on any sale covered by the Agreement is not less than the established reference price.  Third, Commerce is authorized to require – and the Brazilian Exporters have agreed to provide – information concerning each sale on computer disk, including each adjustment applicable to each sale.  Finally, the Brazilian Exporters have agreed to permit onsite inspection of all information for purposes of verification, as Commerce deems necessary.  Agreement, Part VII, 64 Fed. Reg. at 38,794.

The Domestic Producers mount two attacks on the monitoring provisions of the Agreement. Their first challenge generally echoes their arguments concerning the Agreement's provisions concerning the 15% limitation on dumping, outlined in section III.B above. Specifically, the Domestic Producers argue that, in the absence of specific provisions requiring the reporting of Brazilian cost and price data, it is impossible for Commerce to monitor compliance with the 15% limit on dumping. Plaintiffs' Memo at 23. The Domestic Producers also criticize Commerce's failure both to define the term "estimated normal value" in the Agreement and to explain how that value should be calculated. According to the Domestic Producers, the Brazilian Exporters' "agreement" to comply with the 15% limit is meaningless in the absence of such a definition. Plaintiffs' Memo at 23.

The Government defends the decision not to define "estimated normal value" in the Agreement, emphasizing that the statute does not define the term either. The Government further contends that, should Commerce determine that it needs normal value data, it is entitled to obtain that data from the Brazilian Exporters under Part V of the Agreement (which requires the Brazilian Exporters to provide "all information that the Department determines is necessary" to verify compliance). Defendant's Memo at 28-32, 52-53.[22]

The Domestic Producers' second attack on the monitoring provisions of the Agreement targets the provisions for disclosure, comment on and verification of domestic sales prices. Dissatisfied with Parts VI and VII.B. of the Agreement, which provide that Commerce "may" make

---

[22]The Brazilian Exporters assert that, under PPG Industries, Inc. v. United States, the monitoring requirements of the statute may be satisfied even in the absence of routine reporting requirements. See Defendant-Intervenors' Memo at 41, *citing* 11 CIT 344, 358, 662 F.Supp. 258, 270 (1987). The Domestic Producers have not responded to that claim.

information available to them, the Domestic Producers assert that "[f]undamental fairness and public interest" instead require that any Agreement expressly permit their participation in the monitoring and enforcement process. Plaintiffs' Memo at 24.

The Government dismisses the Domestic Producers' argument out of hand, pointing to the language of the statute, which requires the practicability of "effective monitoring of the agreement *by the United States.*" Defendant's Memo at 53-54 (*citing* 19 U.S.C. § 1673c(d)(2)) (emphasis in the original). Moreover, the Government notes, the Domestic Producers are free to enhance their "participation in the enforcement and monitoring of Brazilian exports" by requesting an administrative review. Defendant's Memo at 54 (*quoting* Plaintiff's Memo at 24, which actually refers to "Brazilian exporters").

Although the requirement for practicable, effective monitoring is common to both types of suspension agreements, it seems clear that the nature of the monitoring required to ensure compliance might vary depending on whether the agreement provides for the complete cessation of exports or the total elimination of dumping (a subsection (b) agreement) or merely the elimination of its injurious effects (a subsection (c) agreement). Thus, affording the Domestic Producers in this case the opportunity to review and comment on the monitoring provisions of the proposed subsection (b) agreement did not obviate the need to give them the same opportunity to review and comment on the monitoring provisions in any subsection (c) agreement that Commerce decided to consider as an alternative.[23]

---

[23]This is an easy case because, as discussed *passim*, subsection (b) and (c) agreements are fundamentally different. Accordingly, there is no need here to reach the more difficult question – If Commerce makes significant changes to the provisions of a proposed agreement but does not change the type of agreement (*i.e.*, subsection (b) vs. subsection (c) agreement), must Commerce afford petitioners the opportunity to comment on the revised proposed agreement?

It may be that the monitoring provisions in the Agreement at issue here – *e.g.,* the parroting of the 15% limit and the "catch all" provision – are a product of the timing of Commerce's decision to substitute a subsection (c) agreement for the proposed subsection (b) agreement, and the absence of input from the Domestic Producers. The Domestic Producers point out, for example, that the proposed subsection (b) agreement required the Brazilian Exporters to provide detailed home market information to permit Commerce to verify that dumping would be eliminated. Plaintiffs' Memo at 11; Proposed Agreement, Part V. Indeed, as the Domestic Producers note, Commerce has routinely included requirements for the systematic reporting of home market sales and cost data in subsection (b) agreements. Reply Memo at 10.[24]

Assuming that Commerce on remand does not abandon the concept of using a suspension agreement in this case, Commerce will have the opportunity – if it wishes – to explore the possibility of another suspension agreement with different monitoring requirements that may be more responsive to the Domestic Producers' concerns. At a minimum, the Domestic Producers will have an opportunity to make their case on monitoring requirements directly to Commerce, and Commerce

---

[24]Every subsection (b) agreement entered in an antidumping case since 1986 has required quarterly reports of both sales and cost data necessary to determine normal value. *See* Erasable Programmable Read Only Memory Semiconductors From Japan, 51 Fed. Reg. 28,253 (Dep't Commerce 1986); Dynamic Random Access Memory Semiconductors of 256 Kilobits and Above From Japan, 51 Fed. Reg. 28,396 (Dep't Commerce 1986); Gray Portland Cement and Clinker From Venezuela, 57 Fed. Reg. 6,706 (Dep't Commerce 1992); Certain Portable Electric Typewriters From Singapore, 58 Fed. Reg. 39,786 (Dep't Commerce 1993); Color Negative Photographic Paper (CNPP) and Chemical Components Thereof From the Netherlands, 59 Fed. Reg. 43,539 (Dep't Commerce 1994); Sodium Azide From Japan, 62 Fed. Reg. 973 (Dep't Commerce 1997); Certain Cut-to-Length Carbon Steel Plate From South Africa, 62 Fed. Reg. 61,751 (Dep't Commerce 1997); Steel Wire Rod From Venezuela, 63 Fed. Reg. 8,948 (Dep't Commerce 1998).

will have to confront the Domestic Producers' comments and build a proper administrative record on its interpretation of the monitoring provisions of the statute and their application to the facts of this case.

### D.   Extraordinary Circumstances

Subsection (c) agreements are limited to cases involving "extraordinary circumstances" – that is, "circumstances in which – (i) suspension of an investigation will be more beneficial to the domestic industry than continuation of the investigation, and (ii) the investigation is complex." 19 U.S.C. § 1673c(c)(1), (c)(2).   The Domestic Producers contest both parts of Commerce's determination that extraordinary circumstances are present in this case.

### 1.   Whether the Agreement Is More Beneficial to the Domestic Industry than Continuation of the Investigation

As a threshold matter, the Domestic Producers contend that allowing *any* dumping to continue "means that the Agreement is *not* more beneficial" to the domestic industry than would be an antidumping order.   Plaintiffs' Memo at 12 (emphasis in the original).   But, as both the Government and the Brazilian Exporters note, that proposition cannot be squared with the very existence of subsection (c), which – by definition – contemplates suspension agreements that permit a limited amount of dumping to continue.   Defendant's Memo at 38-39; Defendant-Intervenors' Memo at 13-15.

Commerce's determination in this case that suspension is more beneficial to the domestic industry than continuation of the investigation rests on its findings that the Agreement provides greater relief and greater certainty than would an antidumping order.   Defendant's Memo at 35

*(citing* Extraordinary Circumstances Memo). In making those findings, Commerce relied solely on the analysis set out in its Public Interest Memorandum. *See* Defendant's Memo at 35 n. 25 (*citing* Public Interest Memo).

According to Commerce, the Agreement affords the Domestic Producers *greater relief* than an antidumping duty order because it protects them from "future exchange rate-driven surges of Brazilian hot-rolled steel." Defendant's Memo at 35 (*citing* Public Interest Memo). But the Domestic Producers dispute the fundamental premise of Commerce's analysis. The Domestic Producers maintain that the surges of Brazilian steel are attributable *not* to exchange rate fluctuations, but rather to excess production in Brazil and the unavailability of other markets for the steel. Tr. at 10, 16. In short, the Domestic Producers charge, Commerce purports to have been trying to solve a problem that does not exist.

Pressed for record evidence that exchange rate fluctuations result in surges of Brazilian steel, the Government argues that Commerce properly made "logical assumptions and extrapolations" flowing from petitioners' comments on the proposed subsection (b) agreement, which referred to "the sudden decrease in the value of the *real* that occurred during the first few months of 1999." Defendant's Memo at 36 (*citing* Letter from Dewey/Skadden/Schagrin to Commerce) (June 28, 1999) (P.R. Doc. No. 270) at 10-12 *and* Matsushita Elec. Indus. Co. v. United States, 750 F.2d 927, 933 (Fed. Cir. 1984)).

But, as the Domestic Producers note, the comment on which Commerce relies does not suggest that surges in Brazilian steel result from exchange rate fluctuations. Rather, the comment is a complaint about the exchange rate mechanism in the proposed subsection (b) agreement, advocating greater flexibility in light of exchange rate fluctuations (particularly the sudden

devaluation of the Brazilian currency, the *real*).[25]  Tr. at 94-95.  That is indeed a slender reed on which to base "assumptions and extrapolations" concerning the causal relationship (if any) between exchange rate fluctuations and dumping.

"[A]ssumptions and extrapolations" are also the basis for Commerce's finding that the Agreement provides *greater certainty – i.e.*, "a set level of relief that would be unavailable pursuant to an antidumping duty order" – and is thus more beneficial to the domestic industry.  Defendant's Memo at 36-37 (*citing* Public Interest Memo).  The Government maintains that, under an antidumping duty order, "the foreign signatories would be free to set their prices below the prevailing U.S. market price."  Defendant's Memo at 37.  In contrast, under the Agreement, they have agreed not to sell below reference prices.  Defendant's Memo at 37; Agreement, Part IV, 64 Fed. Reg. at 38,794.  *See also* Defendant-Intervenors' Memo at 17-20.

But there is a certain unassailable logic to the Domestic Producers' observation that certainty is not, in and of itself, a virtue – that is, that certainty is not *always* better than uncertainty.[26]  *See* Tr. at 14-15.  Moreover, any suspension agreement will, by definition, provide certainty.  Thus, if mere certainty suffices to make a suspension agreement "more beneficial" to the domestic industry than continuation of an investigation, a suspension agreement would be permissible in any antidumping

[25]Specifically, petitioners objected to the use of a fixed exchange rate, rather than "a six-month moving average exchange rate – to take account of the lag between the incurrence of production costs and sales."  Letter from Dewey/Skadden/Schagrin to Commerce (June 28, 1999) (P.R. Doc. No. 270) at 10-12.  By emphasizing the rapidly fluctuating *real*/dollar exchange rate, petitioners were concerned with securing an exchange rate mechanism that would accurately reflect the Normal Value in dollars, in the event that Commerce finalized a subsection (b) agreement.  *Id.* at 11.

[26]The Domestic Producers also argue that any asserted "certainty" is largely illusory, since the Brazilian Exporters may terminate the Agreement at any time with only 60 days' notice.  Reply Memo at 17.  *See* Agreement, Part XIII.B, 64 Fed. Reg. at 38,795.

proceeding. Clearly, that was not the intent of Congress. *See* S. Rep. No. 96-249 at 71 ("suspension is an unusual action which should not become the normal means for disposing of cases"). Subsection (c) agreements, in particular, are reserved for cases involving "extraordinary circumstances." 19 U.S.C. § 1673c(c)(2); S. Rep. No. 96-249 at 71 (subsection (c) agreements to be accepted only "rarely"). In short, Commerce cannot logically rely on a fact that is true with respect to any investigation as a basis for its determination that a particular case involves extraordinary circumstances.

The same criticism can be leveled at Commerce's finding that the Agreement is "more beneficial" because it provides "a set level of relief" compared to an antidumping duty order. *See* Tr. at 14-15 (*referring to* Public Interest Memo). Commerce's statement simply proves too much. It is true as to every antidumping duty order, because duties always are assessed retroactively (and thus are not "set"). If a "set level of relief" were enough to make a suspension agreement "more beneficial" than an order, the "more beneficial" test would be read out of the statute, because it would be met in every antidumping case. Tr. at 14-15.[27] As the House Committee on Ways and Means emphasized:

> [T]he ["more beneficial"] provision is not intended to be so general as to be meaningless. For example, the expenses saved because of prompt settlement of a case or the certainty of prompt relief may make settlement more beneficial than continuation of the investigation. However, *every suspension of an investigation results in prompt, certain relief and reduced expenses. The Committee does not intend that for this reason every agreement be deemed more beneficial to domestic industry*.

H.R. Rep. No. 96-317 at 65 (1979) (emphasis supplied).

---

[27]Similarly, the Domestic Producers point out that all currency exchange rates fluctuate. As counsel noted, "If the extraordinary circumstances requirement is one that can be met only rarely, a justification that applies in every single case is not a justification." Tr. at 21.

Finally, the Domestic Producers condemn as pure *post hoc* rationalization by counsel the Government's assertion that, under an antidumping order, "the foreign signatories would be free to set their prices below the prevailing U.S. market price." The Domestic Producers argue that Commerce itself made no such finding, and that there is nothing in the administrative record which would support such a finding. Tr. at 15-16 *(referring to* Defendant's Memo at 37).

In addition to the benefits alleged by Commerce as bases for its "more beneficial" determination, the Brazilian Exporters tout certain other asserted benefits to the domestic industry (*see generally* Defendant-Intervenors' Memo at 20-24), which the Domestic Producers basically dismiss. *See generally* Reply Memo at 17-18. For example, while the Brazilian Exporters emphasize that the Agreement limits the types of Brazilian hot-rolled steel products that can be exported to the United States to those for which reference prices have been fixed, the Domestic Producers contend that Commerce has "already expanded the coverage of the Agreement to [include] . . . additional products" and likely will continue to do so "quite possibly at reference prices which are well below U.S. market levels." Reply Memo at 17-18 (footnotes omitted). *Compare* Defendant-Intervenors' Memo at 20-22. The Domestic Producers also contend that "there have been several instances in which the Brazilian signatories appear to have sold hot-rolled products in the U.S. market at prices below the reference prices stipulated in the Agreement." Reply Memo at 18.[28]

Whatever the merits of the Brazilian Exporters' arguments, it is well-settled law that "[t]he grounds upon which an administrative order must be judged are those upon which the record

---

[28]The Government objects to the Domestic Producers' reliance on events that postdate the Agreement, and thus are not part of the administrative record underlying Commerce's decision to suspend the investigation and enter into the Agreement. Tr. at 39-41.

discloses that its action was based." <u>Securities and Exchange Comm'n v. Chenery Corp.</u>, 318 U.S. 80, 87 (1943). Commerce's "more beneficial" determination therefore could not be sustained on the basis of asserted benefits on which it did not rely.

In any event, as discussed in section III.A above, the existing administrative record on the "more beneficial" issue – like the other issues in this case – is insufficient to serve as a basis for judicial review. The Domestic Producers simply had no opportunity to build a record on the "more beneficial" requirement. Because the Proposed Agreement was a subsection (b) agreement, the "more beneficial" requirement was irrelevant; accordingly, the Domestic Producers did not address it in their comments. And they had no notice of the subsection (c) Agreement, and thus no opportunity to comment on whether or not it was more beneficial than continuation of the investigation.

For the reasons set forth in section III.A, this matter is being remanded to remedy Commerce's failure to comply with the notice, comment and consultation requirements of the suspension agreement statute. All parties then will have the opportunity to develop a proper administrative record.[29] For example, assuming that Commerce issues for comment a subsection (c)

---

[29]The Domestic Producers also contend that Commerce's "extraordinary circumstances" determination impermissibly relied upon the interaction of the antidumping and countervailing duty suspension agreements. Plaintiffs' Memo at 17-18. The Domestic Producers argue that Commerce must judge whether or not the Agreement here at issue is "more beneficial" to the domestic industry *without regard to the provisions of the suspension agreement in the countervailing duty case*, because the suspension agreement in that case may be modified or terminated independent of the Agreement here. Plaintiffs' Memo at 17-18. *See generally* Tr. at 12-13, 97-98.

The Government's position on whether, as a legal matter, Commerce is entitled to rely on the CVD suspension agreement in making its "more beneficial" finding on the Agreement here is less than crystal clear – as is its position on whether, as a factual matter, Commerce did so in this case. Defendant's Memo at 42-44; Tr. at 53-57, 101-04. *Cf.* Defendant-Intervenors' Memo at 22-24. Indeed, the Government conceded in the course of oral argument that it would have been

agreement, the Domestic Producers may seek to put on the record for Commerce's consideration any information they may have concerning the Brazilian Exporters' compliance to date with the terms of the existing Agreement. Commerce, for its part, will have ample opportunity to make a proper factual record, to preclude (or at least minimize) the need to rely on "assumptions and extrapolations," and to avoid the risk of being accused of engaging in "*post hoc* rationalization." Commerce also may, if it wishes, adopt – or reject – any or all of the Brazilian Exporters' analysis of the existing Agreement's benefits to the domestic industry. Most importantly, Commerce will have the opportunity to detail precisely why its agreement is "more beneficial" to the domestic industry than an antidumping order – even though a substantial majority of the domestic industry believes that it is not.[30]

In doing so, Commerce should bear in mind the history and intent of the "more beneficial" requirement. Subsection (c) agreements are intended for use only in rare cases such as those where "the value of settling the case quickly or the certainty of prompt relief the settlement provides"

---

preferable, for the sake of clarity, for Commerce to have prepared separate extraordinary circumstances memoranda in the two cases. Tr. at 103. On remand, Commerce will have the opportunity to prepare a separate memorandum for this case.

[30]The Government and the Brazilian Exporters emphasize that the Domestic Producers' opposition to the Agreement is not the unanimous view of the domestic industry. Defendant's Memo at 38; Defendant-Intervenors' Memo at 16-17. As discussed in section III.A above, seven U.S. Steel producers sent a letter to Commerce on July 6, 1999 – the date that the Agreement was signed – expressing their views that the Agreement meets the 15% limitation on dumping and will prevent the suppression or undercutting of domestic price levels. Letter from Schagrin Associates to Commerce (July 6, 1999) (P.R. Doc. No. 272). However, as the Domestic Producers note, that letter conspicuously stops well short of stating that the Agreement is more beneficial than would be an antidumping duty order. Reply Memo at 18-19; Tr. at 17-19.

outweighs the benefits of continuing the investigation.  *See, e.g.*, Statements of Administrative

Action for Trade Agreements Act of 1979, H.R. Doc. No. 96-153, Part II at 420 (1979).  As the

Domestic Producers note:

> A suspension agreement is a tool to be used in lieu of completing an investigation, without taking the time and resource-consuming burdens of completing an extraordinarily complex investigation.  In this case, the Department had completed its investigation by the time that it signed the Agreement, and issued its final determination simultaneously with the Agreement.  In fact, the final determination identified, addressed at length, and resolved all issues.  The Department did not use the suspension agreement in the manner intended by . . . the Administration . . . , or by the Congress.

Plaintiffs' Memo at 13.[31]

Moreover, while it is true that Congress entrusted the "more beneficial" determination to

Commerce,[32] and did not expressly accord the domestic industry a veto power,[33] any decisionmaker

should be chary of concluding that a particular course of action is in the best interests of an industry

that generally opposes it.  As Senator Heinz observed during floor debate on the suspension

agreement statute, "I would find it very difficult to believe a judgment that the domestic industry

---

[31]Commerce emphasizes that the ITC had not yet rendered its final determination when the Agreement was executed. Defendant's Memo at 39-40.  But, again, Commerce's argument proves too much.  An affirmative determination from the ITC is a prerequisite to the issuance of an antidumping duty order.  If the fact that a final ITC determination had not yet issued sufficed to make a suspension agreement "more beneficial" to the domestic industry, the "more beneficial" requirement would be satisfied in every investigation, and thus every investigation would be a candidate for a subsection (c) suspension agreement.

[32]*See* Defendant's Memo at 37 *and* Defendant-Intervenors' Memo at 12, *citing* 19 U.S.C. § 1673c(c)(1) ("If the administering authority determines that extraordinary circumstances are present . . .").

[33]*See generally* Tr. 29-30, 58-59, 61-63, 65-66, 84-85, 93-94, 98-99.

would benefit more from a suspension than a completed investigation if that industry had expressed

its opposition to such an action." 125 Cong. Rec. 20,168 (July 23, 1979).[34]

### 2. Whether the Investigation Was Complex

Even if Commerce properly concluded that the Agreement is more beneficial to the domestic

industry than continuation of the investigation, that would not be enough to constitute the

"extraordinary circumstances" required to justify a subsection (c) agreement. Commerce must also

determine that the investigation is "complex." 19 U.S.C. § 1673c(c)(2)(A)(ii). The Domestic

Producers vigorously dispute that determination in this case.

For purposes of the suspension agreement statute, an investigation is deemed "complex" if

"(i) there are a large number of transactions to be investigated or adjustments to be considered, (ii)

the issues raised are novel, or (iii) the number of firms involved is large." 19 U.S.C. §

1673c(c)(2)(b). Commerce relied on the first two criteria in determining that the investigation here

at issue was complex. *See* Extraordinary Circumstances Memo.

---

[34]Indeed, Commerce's Chief Counsel for Import Administration conceded that the "more beneficial" requirement presented a "serious obstacle" in another case where industry opposition to a subsection (c) agreement was anticipated. *See* Tr. 30, 93-94, *referring to* Memorandum from Chief Counsel for Import Administration to Ass't Sec. for Import Administration, re: "Uranium Investigation: Legal Options For Settlement," Investigation A-461-801 (May 7, 1992) at 1, 4 ("The legislative history of this ["more beneficial"] provision indicates that Congress arguably intended it to require that the domestic industry consent to this type of agreement").

Moreover, as discussed in section I.A above, there were only two subsection (c) suspension agreements in antidumping duty investigations prior to the Agreement in this case – and in both of those cases, Commerce obtained petitioners' consent to the agreements. Tr. at 31 (*discussing* Potassium Chloride from Canada, 53 Fed. Reg. 1393 (Dep't Commerce 1988) *and* Fresh Tomatoes From Mexico, 61 Fed. Reg. 56,618 (Dep't Commerce 1996) ).

All parties agree that the investigation involved numerous transactions and adjustments. Plaintiffs' Memo at 15; Defendant's Memo at 40-41; Defendant-Intervenor's Memo at 26. However, the Domestic Producers contend that, in the context of the statute's "extraordinary circumstances" requirement, "large" means large *relative to other investigations*, "*i.e.*, an unusual number which is so burdensome and which renders the investigation so complex that the domestic industry is better served by an agreement suspending the investigation." Plaintiffs' Memo at 15; Reply Memo at 22.[35]

The statute itself is silent on this point. While "large" is a relative term, it is unclear whether it should be interpreted to mean a large number of transactions and adjustments relative to other antidumping duty investigations generally, or large in relation to other antidumping duty investigations involving the steel industry, or large in some other way. In light of that ambiguity, analysis would normally proceed to the second prong of the Chevron/Christensen test, to evaluate the reasonableness or persuasiveness of Commerce's interpretation of the phrase "large number." However, Commerce here simply asserted that the investigation "involves a large number of transactions and multiple adjustments." Extraordinary Circumstances Memo. Absent any explanation of Commerce's interpretation of the statute, it would be impossible to determine whether "the agency has exercised a reasoned discretion, with reasons that do not deviate from or ignore the

---

[35]The Brazilian Exporters argue that the case "involved a total of *211,138 transactions*!" and claim that "[u]nder any definition of the term, 211,138 is a large number," and that "[e]leven adjustments, times six responding companies, is a large number of adjustments." Defendant-Intervenors' Memo at 25-28 (footnotes omitted) (emphasis in the original). The Domestic Producers maintain that "large" is, by definition, a relative term, and that the investigation here was "in fact, wholly unexceptional in comparison to myriad other antidumping investigations, and particularly those numerous investigations involving flat-rolled steel, with respect to the number of transactions investigated or adjustments considered. There is, in short, nothing extraordinary, complex, or unusual in the number of transactions investigated or adjustments considered in this investigation." Plaintiffs' Memo at 15.

ascertainable legislative intent." *See* Greater Boston Television Corp. v. FCC, 444 F.2d 841, 850 (D.C. Cir. 1970).

For the reasons discussed in section III.A above, this entire case is being remanded to allow the parties to develop a proper administrative record. Assuming that, on remand, Commerce issues this or some other proposed subsection (c) agreement for comment, the Domestic Producers will be able to make their case on this criterion directly to the agency (for the first time, since it is unique to subsection (c) agreements); and Commerce will have the opportunity – with the benefit of the Domestic Producers' comments – to explain the rationale for whatever decision it may make.

As an alternative ground for its determination that the investigation here was "complex," Commerce found that the investigation involved "novel issues." Extraordinary Circumstances Memo. The Government argues that the "affiliation/collapsing analysis" in the investigation was novel because certain aspects of the analysis must be resolved on a case-by-case basis. Defendant's Memo at 41-42. While it may be true that "the unique facts before it required [Commerce] to visit the issue anew," it does not follow that the issue is "novel."[36] *Id.* Every investigation involves unique facts. Commerce has considered the affiliation/collapsing issue in many other investigations,[37] and it failed to make any findings as to why the investigation at issue in this case is distinguishable. *See* Plaintiffs' Memo at 16.

---

[36]As the Domestic Producers note, "the standard for whether an issue is 'novel' *cannot* be whether or not the issue involves case-specific factors; otherwise, nearly every issue addressed in nearly every investigation would be classified as 'novel.' " Reply Memo at 24 (emphasis in the original).

[37]The Government concedes that "[Commerce] has addressed the affiliation and collapsing issues in the past." Defendant's Memo at 41-42. According to the Domestic Producers, "A LEXIS search of Department determinations discussing affiliation and collapsing found more than 200 and more than 30 instances, respectively, of discussion of those issues since January 1998." Plaintiffs' Memo at 16.

Assuming that a proposed subsection (c) agreement is issued for comment on remand, the Domestic Producers will have an opportunity for the first time to make a record before the agency on the novelty of the issues presented in the investigation, and Commerce will have the opportunity to explain its findings on the matter.

### E.    The Public Interest

In addition to satisfying all other applicable requirements, a suspension agreement must serve the public interest as well.  19 U.S.C. § 1673c(d)(1).  In its Public Interest Memorandum, Commerce cited three reasons as bases for its determination that the Agreement in this case is in the public interest.

First, Commerce found that the Agreement will ensure that Brazilian hot-rolled steel is fairly traded on the U.S. market.  Public Interest Memo.  Second, Commerce found that the Agreement will completely eliminate the injurious effects of such imports on the domestic industry.  Public Interest Memo.  Commerce asserted that these first two factors were "[m]ost important[ ]," because they would permit domestic producers to make investments in new plants and equipment, worker training and retraining, and research and development that would benefit producers, workers, and the market as a whole.  *Id.*  Finally, Commerce stated that the Agreement will provide greater certainty to all parties.  Specifically, Commerce found that consumers would benefit because they would have continued access to Brazilian steel at a known level; that domestic producers would benefit from having a set level of relief over the life of the Agreement; and that importers and consumers would benefit by not facing the risk and uncertainty associated with retroactive antidumping duty assessments.  *Id.*

The Domestic Producers dispute each of Commerce's public interest findings (Reply Memo at 25-26) and, further, argue that "loopholes and ambiguities" in the Agreement "serve to eviscerate compliance with and operation of" the trade laws and are not in the public interest. Plaintiffs' Memo at 20-22.

Like the requirement for practicable, effective monitoring (discussed in section III.C above), the public interest requirement is common to both subsection (b) and subsection (c) suspension agreements. But, again, as with the monitoring requirement, it seems clear that analysis of the public interest might vary depending on whether the agreement provides for the complete cessation of exports or the total elimination of dumping (a subsection (b) agreement) or merely the elimination of its injurious effects (a subsection (c) agreement). Thus, the fact that Commerce afforded the Domestic Producers here the opportunity to review and comment on the public interest vis-a-vis the proposed subsection (b) agreement did not relieve it of the obligation to give them the same opportunity as to the subsection (c) Agreement which it decided to substitute.

Assuming that Commerce on remand does not abandon the concept of a suspension agreement in this case, Commerce will have the opportunity – if it wishes – to explore the possibility of another agreement that may be more responsive to the Domestic Producers' concerns. At a minimum, the Domestic Producers will have an opportunity to make their case on the public interest directly to Commerce, and Commerce will have to confront the Domestic Producers' comments and build a proper administrative record on its interpretation of the public interest requirement of the

statute[38] and its application to the facts of this case.[39]

---

[38]The Court in U.S. Steel Group v. United States noted:

In evaluating Commerce's determination that the Agreement is in the public interest, the court would, in a normal case, first decide whether Commerce's interpretation of the statute is in accordance with law. Here, however, Commerce has not articulated an interpretation of the statute in the Public Interest Memorandum itself. Only in subsequent briefing does Commerce interpret the public interest standard . . . .

Rather than articulate a legal standard in the Public Interest Memorandum, Commerce makes a finding of fact [that the market certainty resulting from the Agreement will benefit traders and consumers]. . . . Without more explanation, however, this conclusion is not reviewable, because Commerce has not provided a legal standard for what is "in the public interest," or otherwise articulated how its factual finding is related to the statutory standard.

___CIT___, Slip Op. No. 00-156 at 9-10 (Nov. 21, 2000). Those observations apply with equal force here.

Unlike the statute governing Commerce's authority to terminate an investigation when a petition is withdrawn pursuant to an agreement restricting the volume of imports into the United States, the suspension agreement statute does not define the factors to be considered in evaluating public interest. *Compare* 19 U.S.C. § 1673c(a)(2)(B) ("public interest" determination to consider impact on U.S. consumers, impact on international economic interests of U.S., and impact on competitiveness of domestic industry (including impact on employment and investment) ).

For example, before the Court, the Domestic Producers have asserted that, in determining public interest, Commerce must consider a suspension agreement's impact on the competitiveness of the domestic industry. Plaintiffs' Memo at 19. While the Government apparently concedes that point (Defendant's Memo at 47), the Government contests the Domestic Producers' claim that they are in the best position to assess the impact of the Agreement here on the domestic industry. Defendant's Memo at 48 (*discussing* Plaintiffs' Memo at 20). The Government and the Brazilian Exporters emphasize the language of the statute, which precludes Commerce from suspending an investigation "unless *it* [*i.e.*, Commerce] is *satisfied* that suspension . . . is in the public interest." Defendant's Memo at 48 *and* Defendant-Intervenors' Memo at 38, *quoting* 19 U.S.C. § 1673c(d)(1) (emphasis supplied). The Government argues that the term "satisfied" confers "broad discretion upon Commerce (not the petitioning domestic industry)" in making the public interest determination. Defendant's Memo at 49.

On remand, Commerce will have the opportunity to articulate the legal standard for making its public interest determination, or otherwise explain the "connection between the facts found and the choice made." *See* Electricity Consumers Resource Council v. Federal Energy Regulatory

F.   Prevention of Suppression or Undercutting of Domestic Prices

Commerce may suspend an investigation under subsection (c) only if "the suppression or undercutting of price levels of domestic products by imports of that merchandise will be prevented." 19 U.S.C. § 1673c(c)(1)(A). To that end, Commerce included in the Agreement here a provision for "the implementation of reference prices below which the [Brazilian] signatory producers/exporters agree they will not sell the subject merchandise." Price Suppression Memo at 2.

Specifically, Part IV of the Agreement established the reference prices for four categories of steel products. Future quarterly reference prices for the first category (commercial quality, not pickled and oiled, not temper-rolled, not edge trimmed hot-rolled steel) are set "at the higher of the average U.S. Market Price for that Quarter, less six percent or $327." Agreement, Part IV.C, 64 Fed. Reg. at 38,794. Under the Agreement, the reference prices for each of the other three categories increase incrementally based on the reference price for Category One steel. *Id.* In addition, the Brazilian Exporters are prohibited from importing other hot-rolled steel products unless and until reference prices for those products are agreed upon by Commerce and the Brazilian Exporters. *Id.*

---

Comm'n, 747 F.2d 1511, 1513 (D.C. Cir. 1984) (*citing* Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962) ).

[39]Commerce's Public Interest Memorandum addressed the suspensions of both the antidumping duty investigation and the countervailing duty investigation. For the sake of clarity, Commerce may wish to reconsider that approach on remand. *See* n. 29, *supra*.

Commerce concluded that the Agreement prevents the suppression or undercutting of domestic prices, because "the reference price mechanism built into the Agreement ensures that prices of subject merchandise are comparable to prices of hot rolled steel sold in the U.S. market." Price Suppression Memo at 3. The Government asserts that Commerce's determination is supported by substantial evidence and is otherwise in accordance with law. Defendant's Memo at 44-45.[40]

But the Domestic Producers maintain that the Agreement not only fails to prevent price undercutting, it actually quantifies the amount of price undercutting that is permitted. According to the Domestic Producers:

> The terms of the Agreement specifically permit sales in the United States of hot-rolled steel from Brazil at prices below the average U.S. market price. In fact, whenever the average U.S. market price is above $327/metric ton, the text of the Agreement guarantees that the Brazilian reference price will undercut the average U.S. market price. At all average U.S. market prices above $348/metric ton, the Brazilian reference price will undercut the U.S. market price by six percent.

Reply Memo at 5 (footnotes omitted).[41]

---

[40]As with the "extraordinary circumstances" analysis, the Brazilian Exporters make a number of arguments here that appear to go beyond Commerce's Price Suppression Memorandum. *See* Defendant-Intervenors' Memo at 31-33. But, as discussed in section III.D.1 above, "[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." Securities and Exchange Comm'n v. Chenery Corp., 318 U.S. 80, 87 (1943). Thus, Commerce's determination on price suppression and undercutting must stand or fall on the rationale which Commerce itself articulates.

[41]Indeed, the Domestic Producers assert that "[t]he possibility of price undercutting, inherent in the Agreement, is now a fact." Reply Memo at 6. According to the Domestic Producers, a July 2000 letter from Commerce revising reference prices allows Brazilian producers to sell steel in the U.S. "more than $20/metric ton less than the average U.S. market price." *Id.* But the Government objects to the Domestic Producers' reliance on events that postdate the Agreement, and thus are not part of the administrative record underlying Commerce's decision to suspend the investigation and enter into the Agreement. Tr. at 39-41.

The Domestic Producers also challenge the assertion in Commerce's Price Suppression Memo that, as U.S. market prices rise, reference prices will rise as well.  Reply Memo at 6 (*citing* Price Suppression Memo at 3).  *See also* Defendant-Intervenors' Memo at 31 (asserting that reference prices will match rising U.S. prices "dollar-for-dollar").  According to the Domestic Producers:

> The reference price will not keep pace with the U.S. market price whenever the latter rises above $348, but will rise only ninety-four cents for each dollar of increase in the average U.S. price.  Further, . . . while the Brazilian reference price may rise with the average U.S. market price after it exceeds $348/metric ton (though, as noted, only 94 cents to the dollar), at every average U.S. market price above $327/metric ton, the Agreement specifically provides for undercutting of price levels of domestic products.  Worse, the greater the amount by which the average U.S. market price exceeds $348/metric ton, the greater the extent of undercutting, in an absolute sense, allowed by the Agreement.

Reply Memo at 6 (footnotes omitted).

While the parties have briefed the subject of price suppression and undercutting extensively before the Court, the existing administrative record on this issue – like the record on the other issues in the case – is insufficient to serve as a basis for final judicial disposition.  The Domestic Producers simply had no opportunity to build a record on the requirement for prevention of price suppression/undercutting.  Because the Proposed Agreement was a subsection (b) agreement, that requirement was irrelevant; accordingly, the Domestic Producers did not address it in their comments.  And they had no notice whatsoever of the subsection (c) Agreement, and thus no opportunity to comment at the agency level on whether or not "the suppression or undercutting of price levels of domestic products" would be prevented.  The Domestic Producers have therefore made their case on this point for the first time before the Court, and Commerce has heard it here first.

As discussed in section III.A, this case is being remanded to remedy Commerce's failure to comply with the notice, comment and consultation requirements of the suspension agreement statute. On remand, all parties will have the opportunity to develop a proper administrative record on all issues, including – in the case of a subsection (c) agreement – the requirement for prevention of price suppression/undercutting.  For example, assuming that Commerce issues for comment a subsection (c) agreement, the Domestic Producers may seek to put on the record for Commerce's consideration the facts underlying their concerns about Commerce's July 2000 revision of reference prices.  And Commerce may, if it wishes, expressly adopt – or reject – any or all of the Brazilian Exporters' analysis of the Agreement on this issue.

## IV. **Conclusion**

For the reasons set forth above, this case is remanded to the Department of Commerce to enable it to comply with the notice, comment and consultation requirements of the statute (19 U.S.C. § 1673c(e) ), to enable it to articulate a legal standard for making its public interest determination or otherwise explain the connection between the facts found and the choice made pursuant to the statute (19 U.S.C. § 1673c(d)(1)), and – if appropriate (*i.e.*, in the case of a subsection (c) agreement there Commerce's finding that the investigation is "complex" turns on it) – to enable it to interpret

the phrase "large number" of transactions or adjustments in the context of the "extraordinary

circumstances" requirement of the statute (19 U.S.C. § 1673c(c)(2)(B)(i)).

A separate order will be entered accordingly.


_____
Delissa A. Ridgway
Judge


Decided:   May 29, 2001
               New York, New York