**Slip Op. 00-156**

## United States Court of International Trade

<table>
<tr><td>

U.S. STEEL GROUP, A UNIT OF<br>
USX CORPORATION, ET AL.,<br><br>

                Plaintiffs,<br><br>

        v.<br><br>

UNITED STATES,<br><br>

                Defendant.

</td><td>

Before: Pogue, Judge<br><br>

Court No. 99-08-00523

</td></tr>
</table>

[Agency action remanded for reconsideration consistent with this opinion.]

Decided: November 21, 2000

<u>Dewey Ballantine LLP</u> (<u>Alan Wm. Wolff</u>, <u>Michael H. Stein</u>) and <u>Skadden, Arps, Slate, Meagher & Flom LLP</u> (<u>Robert E. Lighthizer</u>, <u>John J. Mangan</u>) for Plaintiffs.

<u>David W. Ogden</u>, Assistant Attorney General, <u>David M. Cohen</u>, Director, <u>Lucius B. Lau</u>, Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice; <u>Myles S. Getlan</u>, Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, Of Counsel, for Defendant.

### OPINION

**Pogue, Judge:** This matter is before the Court on the motion of U.S. Steel Group, a Unit of USX Corporation; Bethlehem Steel Corporation; Ispat Inland, Inc.; LTV Steel Company, Inc.; and National Steel Corporation (collectively "Plaintiffs"), for Judgment Upon the Agency Record pursuant to USCIT R. 56.2. Plaintiffs challenge the determination of the U.S. Department of Commerce (hereinafter "Commerce" or "the Department") to suspend

the antidumping investigation of Russian steel imports pursuant to a suspension agreement entered into with the Ministry of Trade of the Russian Federation (hereinafter "MOT").  See Hot-Rolled Flat-Rolled Carbon-Quality Steel Products From the Russian Federation, 64 Fed. Reg. 38,642 (Dep't Commerce 1999)(suspension antidumping duty investig.)("Steel From Russia").    Defendant opposes Plaintiffs' motion.[1]

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (1994).


## Background

On September 30, 1998, Plaintiffs filed a petition with Commerce alleging that certain hot-rolled steel products from Russia were being sold in the United States at less than fair value ("LTFV").  See Petition From Law Firm of Dewey/Skadden/Schagrin to Sec of Commerce (P.R. Doc. No. 2)(Sept. 30, 1998).[2]  On October 22, 1998, Commerce initiated an antidumping duty investigation.  See Certain Hot-Rolled Flat-Rolled Carbon-Quality Steel Products From Brazil, Japan, and the Russian Federation, 63 Fed. Reg. 56,607 (Dep't Commerce 1998)(initiation antidumping investig.).  On November 25, 1998, the U.S. International Trade Commission ("ITC") published its preliminary determination, concluding that there was

---

[1]JSC Severstal had intervened in this action on behalf of Defendant, but withdrew on October 19, 2000.

[2]The administrative record contains two lists of documents: (1) public documents, which will be cited as "P.R. Doc"; (2) business propriety documents, which will be cited as "B.P. Doc."

a reasonable indication that the domestic steel industry was threatened with material injury by Russian steel imports.  See Certain Hot-Rolled Steel Products From Brazil, Japan, and Russia, 63 Fed. Reg. 65,221 (USITC 1999)(prel. determ.).

On February 22, 1999, Commerce and MOT initialed a proposed agreement to suspend the antidumping duty investigation of Russian steel imports.  See Pl.'s Mem. Supp. Mot. J. Agency R., at App. 4 ("Pl.'s Br.").  At Commerce's invitation, see Letter to Interested Parties Requesting Comments on Proposed Suspension Agreement (P.R. Doc. No. 418)(Feb. 23, 1999), Plaintiffs submitted comments on the proposed agreement, see Letter From Law Firm of Skadden/Dewey/Shagrin Submitting Comments on Proposed Suspension Agreement (P.R. Doc. No. 424)(Apr. 5, 1999).  After further negotiations with MOT, Commerce changed the proposed agreement somewhat, see Pl.'s Br. at 4, and on July 12, 1999, entered into a suspension agreement pursuant to 19 U.S.C. § 1673c(l).  See Steel From Russia, 64 Fed. Reg. at 38,643 (App. I)(hereinafter "Agreement").

Prior to entering into the suspension agreement, on February 25, 1999, Commerce made a preliminary determination that Russian hot-rolled steel was being, or was likely to be sold in the U.S. at LTFV.  See Hot-Rolled Flat-Rolled Carbon-Quality Steel Products From the Russian Federation, 64 Fed. Reg. 9,312 (Dep't Commerce 1999)(prel. determ.).  On July 7, 1999, the Plaintiffs requested that Commerce continue its antidumping duty investigation of Russian steel.  See Letter From Law Firm of Dewey/Skadden/Schagrin

to Sec of Commerce (P.R. Doc. No. 375)(July 7, 1999). On July 19, 1999, Commerce published its final determination of sales at less-than-fair value, see Hot-Rolled Flat-Rolled Carbon-Quality Steel Products From the Russian Federation, 64 Fed. Reg. 38,626 (Dep't Commerce 1999)(final determ.), and also published notice that it was suspending the investigation in light of the Agreement, see Steel From Russia, 64 Fed. Reg. at 38,642. On August 27, 1999, the ITC published its final determination, confirming that the domestic industry was being materially injured by reason of imports of Russian steel. See Certain Hot-Rolled Steel Products From Brazil and Russia, 64 Fed. Reg. 46,951 (USITC 1999)(final determ.).

Plaintiffs allege that Commerce unlawfully entered into the Agreement because the terms of the Agreement fail to meet two of the requirements of the governing statute. See Pl.'s Br. at 2. Pursuant to 19 U.S.C. § 1673c(l), Commerce may enter into a suspension agreement with a nonmarket economy only if, first, the agreement is in the public interest and may be effectively monitored,[3] and second, the agreement prevents price suppression or undercutting. See 19 U.S.C. § 1673c(l)(1) (1994). The notice of Commerce's decision to suspend the investigation does not itself contain an analysis of the statutory requirements or the evidentiary basis for the agency's decision. Rather, Commerce adopted, and incorporated by reference, two "Memoranda": the "Price Suppression Memorandum" (P.R. Doc. No. 396)(July 12, 1999), and the

---

[3]Commerce's determination that the Agreement may be effectively monitored has not been challenged here.

"Public Interest Memorandum" (P.R. Doc. No. 426)(July 12, 1999). It is these memoranda that provide the basis for the agency's decision.

## Standard of Review

Commerce's determination to suspend the antidumping duty investigation at issue here is reviewable pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iv).  See 19 U.S.C. § 1516a(a)(2)(B)(iv) (1994). The court must sustain Commerce's final determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B).

In determining whether Commerce's interpretation and application of the antidumping statute is in accordance with the law, "[f]irst, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  Chevron U.S.A. Inc. v. Natural Resources Defense Council, 467 U.S. 837, 842-43 (1984)(citing several pre-1984 cases).  If the statute is ambiguous, then the court must consider whether the format in which the interpretation is expressed is a format that carries the "force of law."  See Christensen v. Harris County, 120 S. Ct. 1655, 1662 (2000).  If it is, then the court asks whether the agency's interpretation of the statute is reasonable.  See Chevron, 467 U.S. at 842.  If the agency's interpretation of an ambiguous statute is expressed in a

format that does not carry "the force of law," it is "'entitled to respect' . . . but only to the extent that [the] interpretation[] ha[s] the 'power to persuade.'" <u>Christensen</u>, 120 S. Ct. at 1663 (quoting <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134, 140 (1944)).[4]

Substantial evidence is "something less than the weight of the evidence." <u>Consolo v. Federal Maritime Com.</u>, 383 U.S. 607, 620 (1966). Nonetheless, Commerce must present "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Gold Star Co. v. United States</u>, 12 CIT 707, 709, 692 F. Supp. 1382, 1383-84 (1988)(internal quotation omitted), <u>aff'd sub nom.</u> <u>Samsung Elec. Co. v. United States</u>, 873 F.2d 1427 (Fed.

---

[4]Counsel for Commerce asks us to give <u>Chevron</u> deference to the legal interpretations contained in the Price Suppression and Public Interest Memoranda. <u>See</u> Def.'s Supp. Br. at 1-4. Because of our conclusion that Commerce's memoranda are on their face not in accordance with law, we do not decide here whether <u>Chevron</u> or <u>Christensen</u> applies.

We note, however, that, as far as is apparent from the record at hand, the domestic producers had neither notice of nor an opportunity to comment on the memoranda. The rationale behind <u>Chevron</u> was to recognize instances in which Congress had implicitly delegated primary interpretational authority of the statute to the agency, and thus intended to prevent the judiciary from substituting its interpretation of the statute for that of the agency's. <u>See</u> <u>Chevron</u>, 467 U.S. at 842-44. Where it is clear that Congress intended to delegate interpretational authorityßthat is, in the cases of formal adjudication and notice-and-comment rulemakingßCongress also provided for due process protection as a counter to the exercise of coercive governmental power. <u>See</u> 5 U.S.C. §§ 553, 554, 556, 557. In the absence of due process protection, it would appear problematic to infer that Congress intended the agency to use this format to act with "the force of law." <u>See</u> <u>E.I. du Pont de Nemours and Company v. United States</u>, 24 CIT __, __, slip op. 00-122, at 8 n.6 (Sept. 20, 2000) (declining, in dicta, to extend <u>Chevron</u> deference to a Treasury Decision because there was no evidence of formal rulemaking procedures)(citing <u>Christensen</u>, 120 S. Ct. at 1662). <u>See also</u> <u>Luigi Bormioli Corp., Inc. v. United States</u>, 24 CIT __, __, slip op. 00-134, at 9 (Oct. 19, 2000).

Cir. 1989). The possibility of drawing two inconsistent conclusions from the same evidence does not mean that the agency's finding is unsupported by substantial evidence. See Consolo, 383 U.S. at 620. In other words, Commerce's determination will not be overturned merely because the plaintiff "is able to produce evidence . . . in support of its own contentions and in opposition to the evidence supporting the agency's determination." Torrington Co. v. United States, 14 CIT 507, 514, 745 F. Supp. 718, 723 (1990)(internal quotation omitted), aff'd 938 F.2d 1276 (Fed. Cir. 1991). Commerce's conclusions must, however, be "reached by 'reasoned decisionmaking,' including an examination of the relevant data and a reasoned explanation supported by a stated connection between the facts found and the choice made." Electricity Consumers Resource Council v. Federal Energy Regulatory Com., 747 F.2d 1511, 1513 (D.C. Cir. 1984)(citing Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962)).

## Discussion

Commerce's statutory authority to terminate or suspend an antidumping investigation is found in Section 734 of the Tariff Act of 1930 ("1930 Act").[5]  See 19 U.S.C. § 1673c.  Section 734(l),

---

[5]Section 734(a) gives Commerce the authority to terminate an investigation upon the withdrawal of the petition, which may occur pursuant to an agreement restricting the volume of imports into the United States.  See 19 U.S.C. § 1673c(a).  Before concluding a quantitative restriction agreement, Commerce must determine whether it is in the public interest by taking into account three factors:

(i) whether, based upon the relative impact on consumer

which governs the Agreement with MOT, gives Commerce the authority to suspend an investigation with a nonmarket economy, pursuant to an agreement restricting the volume of imports into the United States.  See 19 U.S.C. § 1673c(l)(1).  Suspension agreements under subsection (l) must meet the criteria of subsection (d).  See 19 U.S.C. § 1673c(l)(1)(A). Subsection (d) allows Commerce to enter into an agreement only if it is in the public interest and is capable of being effectively monitored. See 19 U.S.C. § 1673c(d). A suspension agreement with a nonmarket economy must also prevent price suppression or undercutting.  See 19 U.S.C. § 1673c (l)(1)(B).

---

prices and the availability of supplies of merchandise, the agreement would have a greater adverse impact on United States consumers than the imposition of antidumping duties;
(ii) the relative impact on the international economic interests of the United States; and
(iii) the relative impact on the competitiveness of the domestic industry producing the like merchandise, including any such impact on employment and investment in that industry.

19 U.S.C. § 1673c(a)(2)(B).
     Section 734(b) gives Commerce the authority to suspend an investigation pursuant to an agreement with foreign producers stating either that they will cease dumping, or that they will cease exporting to the United States. See 19 U.S.C. § 1673c(b). Section 734(c) provides Commerce the authority to suspend an investigation pursuant to an agreement with foreign producers stating that they will "eliminate completely the injurious effect" of their exports to the United States. See 19 U.S.C. § 1673c(c). Given that a 734(c) agreement does not require foreign producers to either cease dumping or cease exporting, Congress has instructed Commerce to enter into such an agreement only when there are "extraordinary circumstances."  See 19 U.S.C. § 1673c(c)(1). "Extraordinary circumstances" are those in which the investigation is complex, and the suspension would be more beneficial to the domestic industry than the continuation of the investigation. See 19 U.S.C. § 1673c(c)(2)(A).

## I. Commerce's "Public Interest" Determination

Under the first prong of the statute, Commerce may enter into a suspension agreement only if it is in the public interest.  See 19 U.S.C. § 1673c(l)(1)(A).  In evaluating Commerce's determination that the Agreement is in the public interest, the court would, in a normal case, first decide whether Commerce's interpretation of the statute is in accordance with law.  Here, however, Commerce has not articulated an interpretation of the statute in the Public Interest Memorandum itself.  Only in subsequent briefing does Commerce interpret the public interest standard; a post hoc rationalization for agency action may not, however, be accepted by this court.  See, e.g., Allegheny Ludlum Corp. v. United States, 24 CIT __, __, slip op. 00-109, at 43 n.41 (Aug. 28, 2000)("[T]he court declines to let Defendant's counsel read into the Final Determination a rationale not advanced by the commissioners themselves."); see also Burlington Truck Lines, 371 U.S. 156, 168-69 ("The courts may not accept . . . counsel's post hoc rationalizations for agency action; [SEC v. Chenery Corp., 332 U.S. 194, 196 (1947),] requires that an agency's discretionary order be upheld, if at all, on the same basis articulated in the order by the agency itself.").

Rather than articulate a legal standard in the Public Interest Memorandum, Commerce makes a finding of fact, see Def.'s Supp. Br. at 10, that, following entry into the Agreement, "[t]he resultant increase in market certainty will benefit traders and consumers of Hot-Rolled Flat-Rolled Carbon-Quality Steel Products."  Public

Interest Mem. at 2.  From this, Commerce concludes that it is in the public interest to enter into the Agreement.  Without more explanation, however, this conclusion is not reviewable, because Commerce has not provided a legal standard for what is "in the public interest," or otherwise articulated how its factual finding is related to the statutory standard.

The court must "satisfy itself that the agency exercised a <u>reasoned</u> discretion, with reasons that do not deviate from or ignore the ascertainable legislative intent."  <u>See</u> <u>Greater Boston Television Corp. v. FCC</u>, 444 F.2d 841, 850 (D.C. Cir.)(1971)(emphasis added).  Here, given the agency's failure to explain its public interest determination, this Court cannot determine that Commerce connected its "market certainty" finding to its conclusion that the Agreement is in the public interest in a reasoned way that is in accordance with the statute.  Accordingly, the court is not satisfied that Commerce exercised reasoned discretion.  Commerce's public interest determination is remanded so that Commerce may articulate a legal standard for making its public interest determination, or otherwise explain the connection between the facts found and the choice made pursuant to the statute.[6]

---

[6]We decline to undertake a "substantial evidence" review of Commerce's factual finding regarding market certainty pending Commerce's redetermination on remand.

## II.  Commerce's Determination that the Agreement Will Prevent Price Suppression or Undercutting

Under the second prong of the statute, Commerce may enter into a suspension agreement only if it "will prevent the suppression or undercutting of price levels of domestic products by imports of the merchandise under investigation."  19 U.S.C. § 1673c(l)(1)(B).  In its Price Suppression Memorandum, Commerce articulates a sort of legal standard; it is, however, a standard that, on its face, is not in accordance with the law.

Commerce argues that neither the statute, Commerce regulations, nor the legislative history contain a definition of "price suppression or undercutting," and that therefore Commerce "has broad discretion to apply reasonable interpretations of the antidumping law."  Price Suppression Mem. at 1-2.  Commerce interprets the statute to mean that subsection (l) agreements with nonmarket economies "allow for some amount of price affect [sic] on domestic price levels." Id. at 3.  Consequently, Commerce reasons that it may enter legally into an agreement that involves a fungible commodity, such as the steel at issue in this case, "the introduction of even a small quantity of [which] should, under basic supply and demand theory, have some tendency to affect prices." Id.  In its brief, Commerce attempts to refine this proposed standard by arguing that the court should "import" the "significant degree" standard from the statute governing the ITC's price analysis for purposes of making its material injury

determination.[7]  Def.'s Mem. Opp. to Pl.'s Mot. J. Agency R. at 31-

36 ("Def.'s Br.").  Commerce thereby suggests that a subsection (l)

agreement must prevent not all price suppression, but rather all

significant price suppression; put another way, "a subsection (l)

agreement may properly permit minor or inconsequential injury

through minor or inconsequential price suppression." Def.'s Br. at

34.

Plaintiffs disagree with Commerce's legal analysis, asserting

that the statute states plainly on its face that no price

suppression or depression is allowed under subsection (l)

agreements.   See Pl.'s Br. at 8, 17-19.   Plaintiffs further

disagree with Commerce's presumption that the introduction of any

amount of a fungible commodity tends to affect prices: "subject

imports, priced at a high enough level, would not suppress or

depress prices . . . ." Id. at 19.

Plaintiffs' contention that the meaning of the statute is

clear on its face does not persuade us.  One could understand the

word "prevent" to mean "preclude."   See The American Heritage

_____

[7]Section 771(7)(C) of the 1930 Act provides:

> In evaluating the effect of imports of [subject]
> merchandise on prices, the [ITC] shall consider whether
> (I) there has been significant price underselling by the
> imported merchandise as compared with the price of like
> products of the United States, and (II) the effect of
> imports of such merchandise otherwise depresses prices to
> a significant degree, or prevents price increases, which
> otherwise would have occurred, to a significant degree.

19 U.S.C. § 1677(7)(C)(ii)(I)-(II) (emphasis added).

Dictionary 1436 (3d ed. 1992).  In this sense, "prevent price suppression" would mean that Commerce could enter into a suspension agreement only if it excluded the possibility of price suppression. But "avert" and "impede" are also synonyms of "prevent."  See id. "Avert" means "to ward off," see id. at 128, and "impede" means "to retard or obstruct the progress of," see id. at 905.  This second sense of the word implies more flexibility; Commerce could enter into a suspension agreement so long as the agreement counteracted price suppression.  The language itself has two different meanings, and thus the statute is by definition ambiguous.  The rules of statutory construction may present a clear choice on remand between differing interpretations of an ambiguous provision; these rules do not, however, advance the argument asserted by Plaintiffs that the statute is clear on its face.  See Pl.'s Reply Br. at 3-6.

We do not accept Commerce's interpretation of the statute, however, because the interpretation set forth in the Price Suppression Memorandum itself is, on its face, not in accordance with the law.  FCC v. RCA Communications, Inc., 346 U.S. 86, 90 (1953), made clear that "Congress did not purport to transfer its legislative power to the unbounded discretion of the regulatory body."  Commerce's proposed standardВ"allow[s] for some amount of price affect [sic] on domestic price levels"Вplaces no limit on Commerce's discretion to determine that an agreement prevents price suppression or undercutting.  While we recognize that Commerce has substantial discretion to negotiate suspension agreements with

nonmarket economies, Commerce has here adopted a standard that allows it, contrary to law, to exercise "unbounded" discretion.[8]

In short, given the agency's failure to articulate a proper legal standard to guide its price suppression determination, the Court is not satisfied that Commerce exercised reasoned discretion in arriving at the conclusion that the Agreement prevents price suppression or undercutting.  Therefore, Commerce's price suppression determination is remanded so that Commerce may articulate an appropriate legal standard for making its price suppression determination, or otherwise explain the connection between the facts found and the choice made pursuant to the statute.[9]

---

[8]The "significant degree" standard forwarded in Commerce's brief must be disregarded here because, once again, it is plainly a post hoc rationalization.  See Allegheny Ludlum, 24 CIT at __, slip op. 00-109, at 43 n.41; Burlington Truck Lines, 371 U.S. at 168-69.  Although Commerce mentions the "significant degree" standard used by the ITC in the Price Suppression Memorandum, see Price Suppression Mem. at 3, it is not clear that Commerce's "some amount" means "a significant degree."

[9]We decline to undertake a "substantial evidence" review of Commerce's factual findings regarding price suppression or undercutting pending Commerce's redetermination on remand.

## Conclusion

Commerce shall reconsider its determination in a manner consistent with this opinion, pursuant to 19 U.S.C. § 1516a(c)(3). Commerce shall file its remand determination with the Court within 90 days.  Plaintiffs are granted 30 days to file comments on the remand determination.  Commerce may respond to any comments filed within 20 days.

_____
Donald C. Pogue
Judge


Decided:   November 21, 2000
           New York, New York