**Slip Op. 01-110**

# United States Court of International Trade

| |
|---|
| U.S. STEEL GROUP, A UNIT OF USX CORPORATION, ET AL., |
| Plaintiffs, |
| v. |
| UNITED STATES, |
| Defendant. |

BEFORE: Pogue, Judge

Court No. 99-08-00523

[Agency determination on remand affirmed.]

Decided: August 29, 2001

Dewey Ballantine LLP (Michael H. Stein, Bradford L. Ward, Navin Joneja) for Plaintiffs.

Stuart E. Schiffer, Acting Assistant Attorney General, David M. Cohen, Director, Lucius B. Lau, Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice; Peter G. Kirchgraber, Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, Of Counsel, for Defendant.

**OPINION**

**Pogue, Judge:**  On November 21, 2000, this Court issued U.S. Steel Group v. United States, 24 CIT __, 123 F. Supp. 2d 1365 (2000) ("U.S. Steel I").  That opinion ordered the Department of Commerce ("Commerce" or "the Department") to reconsider on remand its determination that a suspension agreement entered into with the Ministry of Trade of the Russian Federation ("the Agreement") was

in the public interest and prevented price suppression or undercutting, as required by the statute.  See 19 U.S.C. § 1673c(l)(1) (1994).  Familiarity with that opinion is presumed.

The Court now reviews Commerce's Final Redetermination Pursuant to Court Remand ("Redetermination").  Jurisdiction lies under 28 U.S.C. § 1581(c).

**Standard of Review**

Commerce's Redetermination must be sustained unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

Substantial evidence is "something less than the weight of the evidence." Consolo v. Federal Maritime Com., 383 U.S. 607, 620 (1966). Nonetheless, Commerce must present "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938) (quoted in Gold Star Co. v. United States, 12 CIT 707, 709, 692 F. Supp. 1382, 1383-84 (1988), aff'd sub nom. Samsung Electronics Co. v. United States, 873 F.2d 1427 (Fed. Cir. 1989)). The possibility of drawing two inconsistent conclusions from the same evidence does not mean that the agency's finding is unsupported by substantial evidence. See Consolo, 383 U.S. at 620. In other words, Commerce's determination will not be overturned merely because the plaintiff "is able to produce evidence . . . in

support of its own contentions and in opposition to the evidence supporting the agency's determination." <u>Torrington Co. v. United States</u>, 14 CIT 507, 514, 745 F. Supp. 718, 723 (1990)(internal quotation omitted), <u>aff'd</u>, 938 F.2d 1276 (Fed. Cir. 1991).

Commerce's conclusions must in any event be "reached by 'reasoned decisionmaking,' including an examination of the relevant data and a reasoned explanation supported by a stated connection between the facts found and the choice made." <u>Electricity Consumers Resource Council v. Federal Energy Regulatory Com.</u>, 747 F.2d 1511, 1513 (D.C. Cir. 1984)(citing <u>Burlington Truck Lines, Inc. v. United States</u>, 371 U.S. 156, 168 (1962)).

## Discussion

### I.   Commerce's "Public Interest" Determination

Under the first prong of the statute, 19 U.S.C. § 1673c(l)(1)(A), Commerce may enter into a suspension agreement only if it is "satisfied that suspension of the investigation is in the public interest." 19 U.S.C. § 1673c(d)(1). In evaluating Commerce's determination that the Agreement is in the public interest, the Court first decides whether Commerce's interpretation of the statute is in accordance with law.

In the Redetermination, Commerce reads the statute to confer to it broad discretion in making a subsection (l) public interest determination. In support of this position, Commerce points to the

lack of a definition of the "public interest" in both the statute and the legislative history, as well as the use of the word "satisfied," which it suggests connotes a highly subjective state of mind.  See Redetermination at 14 & n.23.

U.S. Steel does not deny that Commerce has broad discretion in making a public interest determination, but asserts that,

> in analyzing the effects and benefits on the U.S. industry, the Department must take into account the alternatives available to the domestic industry in the absence of a suspension agreement. That is, the benefits to the U.S. industry should be evaluated relative to the effects of an antidumping duty investigation (and order) rather than by comparing the effects of the Suspension Agreement to no relief at all.

Pl.'s Comments at 16.  Further, U.S. Steel argues that Commerce is required by the statute to explain how "other" factors it considered in making its public interest determination "outweigh the very real, direct and vital interests of the domestic steel industry."  Id. at 18.

Commerce's broad understanding of "the public interest" accords with the clear intent of Congress.  See Chevron U.S.A. Inc. v. Natural Resources Defense Council, 467 U.S. 837, 842-43 (1984).  The language of section 1673c(d)(1), "in the public interest," does not include any further limiting language, such as that of section 1673c(a)(2)(B), which requires Commerce to take three specific public interest factors into account.[1]   See 19 U.S.C. §

---

[1]Commerce considered, but was not controlled by, the factors articulated in subsection (a)(2)(B), using them as a "useful

1673c(a)(2)(B).  Thus, the plain language of the statute indicates that Congress intended Commerce to have broad discretion in making its public interest determination, and this Court will not impose limits on Commerce's discretion that were not imposed by Congress. See Whitman v. Am. Trucking Ass'ns, 121 S.Ct. 903, 913 (2001) (finding an "intelligible principle" in various statutes authorizing regulation in the "public interest") (citing National Broadcasting Co. v. United States, 319 U.S. 190, 225-226 (1943); New York Cent. Sec. Corp. v. United States, 287 U.S. 12, 24-25 (1932)).

Moreover, the Court finds no support in the legislative history for Plaintiff's argument that Commerce's discretion is limited by the interest of the domestic industry.  Congress did state its intent that "investigations be suspended only when that action serves the interest of the public and the domestic industry affected," which could suggest that one of the factors Commerce must consider is the interest of the domestic industry.[2]  See S. Rep. No. 96-249, at 71 (1979), reprinted in 1979 U.S.C.C.A.N. 381, 457.  And a different part of the statute directs Commerce to suspend an investigation only if suspension is "more beneficial to

---

conceptual framework that the Department has used to inform its analysis . . . ."  Redetermination at 14.

[2]It is clear in this case that Commerce did take the interest of the domestic industry into account.  See Redetermination at 15-17.

the domestic industry" than the continuation of investigation. <u>See</u> 19 U.S.C. § 1673c(c)(2)(A)(i); <u>see</u> <u>also</u> S. Rep. No. 96-249, at 68 (1979), <u>reprinted in</u> 1979 U.S.C.C.A.N. at 454. Congress did not, however, apply this language to agreements with nonmarket economies under subsection (l). Thus, while the legislative history may indicate that a suspension agreement must benefit the domestic industry to be in the public interest, there is nothing to suggest that a suspension agreement must be more beneficial than an order, or that "other" factors must outweigh the interest of the domestic industry, in order for the agreement to be legal under the statute.

The Court next reviews whether Commerce's public interest determination is supported by substantial evidence, and whether Commerce adequately explained its conclusion that the Agreement is in the public interest. In the Redetermination, Commerce considers three public interest factors: U.S. producer and worker interests, consumer benefits of the suspension agreement, and the international economic interest of the United States. <u>See</u> Redetermination at 15-19.

U.S. Steel does not contest that the Agreement serves the interests of consumers and the international economic interest of the United States, but objects to Commerce's finding that the Agreement serves U.S. producer interests. U.S. Steel asserts that "where, as here, antidumping duty margins are so high as to be prohibitive, the certainty of no imports at all provided by an

order is plainly preferable" to the Agreement, which allows in certain quantities of Russian steel.  Pl.'s Comments at 17.  U.S. Steel also argues that Commerce cannot claim a "market certainty" benefit, because the adjustment procedures that are part of the Agreement make it just as uncertain as an order subject to administrative review.[3]  See id.

While the domestic producers may prefer an antidumping order, as discussed above, Commerce is not required under the statute to provide substantial evidence that the Agreement serves the domestic producers' interest more than an order would; Commerce is rather required to provide substantial evidence that the Agreement is in the public interest.  Similarly, it is not incumbent upon Commerce to provide substantial evidence that the Agreement is more stable and certain than an order (though Commerce makes this claim); rather, Commerce is required to provide substantial evidence that the Agreement achieves stability and certainty, and explain how stability and certainty serve the public interest.

Under this standard, Commerce's Redetermination withstands scrutiny.  First, Commerce points to the price and quantity limits

---

[3]U.S. Steel raised a similar objection to the draft of the Redetermination.  Commerce responds in the Redetermination that the price and volume limits contained in the Agreement make the Agreement "inherently more stable and predictable than conditions under an order," noting that an order does not contain volume limits and that the amount of duties actually imposed could change significantly through the administrative review process.  See Redetermination at 31 & n.33.

contained in the Agreement, which inherently introduce stability and certainty into the market. <u>See</u> Redetermination at 15-16. Stability and certainty benefit the domestic industry by allowing it "to invest and plan for future growth." <u>Id.</u> at 16. While, as U.S. Steel points out, the price limits are subject to adjustment, Commerce explains that the reference price mechanism in the Agreement creates certainty because it adjusts Russian steel prices to account for changes in the market, so that the price floor is maintained in "real" terms. <u>See</u> <u>id.</u> at 11-12.

Further, Commerce explains that market certainty and stability created by the Agreement benefit consumers by allowing them to continue to purchase hot-rolled steel – the largest merchant steel product – from Russia, albeit in limited quantities and above a price floor. <u>See</u> <u>id.</u> at 18-19. Commerce also explains that the price and volume limits of the Agreement serve the international economic interest of the United States in economic stability and a transition to a market economy in Russia, by allowing Russia to continue to export hot-rolled steel, subject to the limits of the Agreement. <u>Id.</u> at 19.

Commerce relies as well on other features of the Agreement that serve the public interest. For example, the Agreement contains anti-circumvention provisions that promote the integrity and transparency of the Agreement. <u>See</u> Redetermination at 16. Additionally, the Agreement is linked to a comprehensive agreement

covering a broad array of steel products exported from Russia to the United States, such that if Russia withdraws from the comprehensive agreement, Commerce will terminate the suspension agreement.  See id. at 16-17.  This provision protects integrated steel producers who produce hot-rolled steel as well as other steel products covered by the comprehensive agreement.  See id.  Lastly, the Agreement benefits domestic producers by limiting Russian market share to a level prevailing before imports of Russian steel were harming the domestic industry.  See id. at 17.

As Commerce observes, the benefits of the Agreement "are different from those that would accrue to the domestic industry under an antidumping order"; this does not mean, however, that the Agreement is not in the public interest.  Id. at 31.  Commerce points to specific features of the Agreement and then explains how these features serve the public interest, taking into account the interests of the domestic industry and domestic consumers, and the international economic interests of the United States.  Accordingly, Commerce's determination that the Agreement is in the public interest is supported by substantial evidence and otherwise in accordance with law.

## II. Commerce's Determination that the Agreement will Prevent Price Suppression or Undercutting

Under the second prong of the statute, Commerce must determine that a suspension agreement "will prevent the suppression or undercutting of price levels of domestic products by imports of the merchandise under investigation." 19 U.S.C. § 1673c(l)(1)(B). As above, in evaluating Commerce's determination that the Agreement prevents price suppression or undercutting, the Court first decides whether Commerce's interpretation of the statute is in accordance with law.

In U.S. Steel I, the Court held that the language of the statute is ambiguous. See 24 CIT at __, 123 F. Supp. 2d at 1371. The next question, then, is whether or not Chevron deference should be given to the agency's interpretation of the statute. See United States v. Mead Corp., 121 S. Ct. 2164, 2171-73 (2001). An agency's interpretation of a statute,

> qualifies for Chevron deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority. Delegation of such authority may be shown in a variety of ways, as by an agency's power to engage in adjudication or notice-and-comment rulemaking, or by some other indication of a comparable congressional intent.

Mead, 121 S. Ct. at 2171.

In concluding that Commerce's interpretation of the statute governing suspension agreements qualifies for Chevron deference,

the Court notes first that Congress appears to have delegated primary authority to Commerce to interpret the antidumping laws generally.  See id. at 2172 ("[I]t can [] be apparent from the agency's generally conferred authority . . . that Congress would expect the agency to be able to speak with the force of law when it addresses ambiguity in the statute . . . .").  Congress stated that, in enacting title 19 with its limited standard of review, it "by law entrusted the decision-making authority in a specialized, complex economic situation to [Commerce]."  See  S. Rep. No. 96-249, at 251-52, reprinted in 1979 U.S.C.C.A.N. at 638; compare Mead, 121 S. Ct. at 2174 (pointing to this court's power of de novo review of Customs classification rulings as evidence that Chevron deference not warranted).  Furthermore,  our appellate court has repeatedly stressed its view that Congress vested Commerce, and not the court, with primary authority to interpret the antidumping laws.  See, e.g., Koyo Seiko Co. v. United States, slip op.  00-1500, at 10 (Fed. Cir. July 20, 2001) ("In antidumping cases, this court has repeatedly recognized 'Commerce's special expertise,' and it has 'accord[ed] substantial deference to its construction of pertinent statutes.'") (quoting Micron Tech v. United States, 117 F.3d 1386, 1394 (Fed. Cir. 1997); Daewoo Elecs. Co. v. International Union of Elec., Tech., Salaried & Mech. Workers, 6 F.3d 1511, 1516 (Fed. Cir. 1993) (referring to Commerce as the "'master' of antidumping law, [and] worthy of considerable

deference" in questions of statutory interpretation) (internal citations omitted); <u>see</u> <u>also</u>, <u>American Silicon Technologies, et al. v. United States</u>, slip op. 00-1400, at 10 (Fed. Cir. Aug. 16, 2001).

Though it appears that Congress has made a general delegation of authority to Commerce to interpret the statute, <u>Mead</u> makes clear that, where notice-and-comment or formal adjudication procedures are not used, a court should also consider whether Congress "provides for a relatively formal administrative procedure tending to foster the fairness and deliberation that should underlie a pronouncement [with the effect of law]." <u>Mead</u>, 121 S. Ct. at 2172. Because the agencies this court reviews so often interpret the antidumping and countervailing duty statutes in less formal formats than those provided for in the Administrative Procedure Act, we make clear that, our conclusion in this case notwithstanding, less deference may be owed by the Court of International Trade to agency interpretations in other contexts.

The provisions governing subsection (l) suspension agreement determinations do not reach the level of formality of the provisions of the Administrative Procedure Act for formal adjudications and notice-and-comment rulemaking.[4]  Nonetheless, this case presents "circumstances reasonably suggesting that

---

[4]It should be noted that Commerce did give the domestic producers the opportunity to comment on both the Agreement and the Redetermination.  <u>See</u> Redetermination at 2, 3.

Congress . . . thought of [interpretations contained in suspension agreement determinations] as deserving the deference claimed for them here." Id. at 2173. In particular, Congress gave Commerce explicit power to suspend an investigation upon acceptance of a suspension agreement with a nonmarket economy in accordance with subsection 1673c(l). Subsection 1673c(l) requires Commerce to publish a determination that satisfies specific statutory criteria in order to enter into a suspension agreement. Subsection (d), to which subsection (l) refers, further requires Commerce, if it decides not to accept a proposed agreement and thus does not issue a determination, to, "[w]here practicable . . . provide to the exporters who would have been subject to the agreement the reasons for not accepting the agreement and, to the extent possible, an opportunity to submit comments thereon." 19 U.S.C. § 1673c(d).

Commerce's suspension agreement determinations are "relatively formal" and "foster [] fairness and deliberation," insofar as the statute requires Commerce to explain in writing and with reference to specific criteria its reasons for entering into an agreement. Cf. Mead, 121 S. Ct. at 2174-75 (describing the informalities of administrative procedure related to issuance of Customs classification rulings such that these rulings are "best treated like 'interpretations contained in policy statements, agency manuals, and enforcement guidelines[,]" and thus "beyond the Chevron pale") (quoting Christensen v. Harris County, 529 U.S. 576,

587 (2000)).    It therefore appears to this Court that <u>Chevron</u> deference is warranted in this instance, and, accordingly, the Court reviews Commerce's interpretation of the statute for reasonableness.  <u>See</u> <u>Chevron</u>, 467 U.S. at 844.

In the Redetermination, Commerce interprets the language of 1673c(l)(1)(B) to mean that, "a subsection (l) agreement that prevents <u>significant</u> price suppression or undercutting satisfies the statutory requirement that such an agreement prevent price suppression or undercutting, and provides effective relief to the domestic industry."  Redetermination at 7 (emphasis added).  U.S. Steel argues that this interpretation is not in accordance with law because it gives Commerce unbounded discretion, "as the Department can find practically any amount of price suppression to be insignificant."  Pl.'s Comments at 7.  According to U.S. Steel, Commerce must explain how much price suppression is "significant" in order to comply with this Court's order on remand.  <u>Id.</u> at 8.

In <u>U.S. Steel I</u>, the Court found that the word "prevent" is subject to two possible interpretations.  Under one interpretation, tied to the "preclude" definition of "prevent," an agreement would have to prevent all price suppression.  24 CIT at __, 123 F. Supp. 2d at 1371.  Under the second interpretation, tied to the slightly more flexible "impede" or "avert" definition of "prevent," an agreement would have to effectively counteract – without necessarily eliminating – price suppression.  <u>Id.</u>

The Court finds that Commerce's interpretation of the statute is reasonable because it is in accord with the interpretation tied to the latter definition of "prevent," and because, contrary to U.S. Steel's suggestions, this interpretation creates a reviewable standard. How much price suppression is "significant" may be determined on a case-by-case basis. See SEC v. Chenery Corp., 332 U.S. 194, 203 (1947); see also Fabrique De Fer De Charleroi S.A. v. United States, slip op. 01-82, at 21 (CIT July 3, 2001) (holding that Commerce may "reach[] a determination after examining the particular circumstances of the case without formally promulgating an all-inclusive standard"). And any conclusion that an agreement prevents "significant" price suppression must be supported by substantial evidence and explained in a reasoned way.[5]

The Court now considers whether Commerce's conclusion that the Agreement prevents "significant" price suppression and thus provides effective relief to the domestic industry is supported by substantial evidence and explained in a reasoned way, and finds that it is. On remand, Commerce explains that price suppression in the domestic industry was caused by both the large volume and low price of imports of Russian hot-rolled steel; consequently, in

---

[5]Because Commerce's interpretation of the statute is reasonable for the reasons given above, the Court declines to address the merits of the parties' arguments addressed to whether it is acceptable to "import" the "significant degree" language from the statute governing the ITC's injury determinations. See Redetermination at 6-7; Pl.'s Comments at 7, 8-9.

negotiating the Agreement, Commerce took both price and volume factors into account.  The Agreement provides for a moratorium, during which no imports are permitted, followed by a period during which the quantity and price of imports are restricted.  See Redetermination at 8, 11-12.  By comparing the amount of price undercutting that occurred during the ITC preliminary report period (i.e., from October 1997 through September 1998), to the amount of undercutting eliminated by the restrictions on price and volume for the first year of the Agreement, Commerce demonstrates that the amount of undercutting allowed by the Agreement following the moratorium is less then fourteen percent of the undercutting which occurred during the comparison period; in other words, eighty-six percent of price undercutting is prevented.[6]  Id. at 9-10.  This "summary statistic," explains Commerce, is evidence that the price suppression prevented is substantial.  See id. at 29.

In subsequent, "out" years, Commerce asserts that the volume increases are "moderate," such that the largest annual volume allowed is less than thirty percent of the import volume for the

---

[6]According to Commerce, the "eighty-six percent" figure is conservative, because it attributes all of the price difference between domestic and Russian hot-rolled steel to undercutting, rather than other differences such as quality.  See Redetermination at 10-11 & n.21.  Also, Commerce used the highest per-ton price for domestic steel reported by the ITC; if Commerce had used one of the lower prices reported in other sources for the same period, the amount of undercutting for the comparison period would be less, and thus the amount prevented by the Agreement would be more.  See id. at 10 n.19.

comparison period.[7]  See id. at 11.  Price limits in the "out" years will be tied to a reference price established in the first year of the Agreement, and adjusted based on prices of steel from countries not subject to an order.  See id. at 11-12.  This "reference price" mechanism will have the effect of maintaining price restrictions in "real terms," in relation to fairly priced imports.  See Redetermination at 12.

U.S. Steel does not appear to challenge Commerce's conclusion on substantial evidence grounds, but rather challenges the analysis Commerce uses to arrive at its conclusion on several grounds.  See Pl.'s Comments at 9-16.  First, U.S. Steel argues that price undercutting is not a measure of price suppression, because if domestic producers refrain from lowering their prices in response to low-priced imports, domestic prices won't be suppressed, but domestic producers will cede market share.  See id. at 10-12.  In order to effectively prevent price suppression, suggests U.S. Steel, Commerce must analyze how domestic producers will respond in the future to unfairly priced imports.  See id. at 12-13.  Second, according to U.S. Steel, Commere's approach is, contrary to the

---

[7]Commerce also notes that import volumes surged in the fourth quarter of 1998.  See Redetermination at 11.  The largest annual volume of imports allowed under the Agreement would be less than twenty percent of imports recorded for calendar year 1998.  See id. Furthermore, though there is no ITC undercutting data for the fourth quarter of 1998, if the margin of underselling remained the same as in the ITC data for the preliminary report period, then for the calendar year 1998, ninety percent of price suppression was prevented.  See id.

statute, "backward-looking." See id. at 13 (emphasizing the "will prevent" language of section 1673c(l)(1)(B)). Third, because Commerce can't predict the future, U.S. Steel claims that there is no reasoned basis for the volume limits for the "out" years of the Agreement.[8] See id. at 14. Finally, U.S. Steel faults Commerce for "concoct[ing] a post hoc rationalization for a particular decision with no intention of making it generally applicable to future cases." Pl.'s Comments at 15.

While the Court appreciates U.S. Steel's observation that price undercutting and price suppression are not always directly related, it does little to undercut the validity of Commerce's analysis in the case at hand. The statute requires Commerce to prevent price suppression or price undercutting, so an agreement that prevents significant price undercutting is acceptable, especially where, as here, price undercutting caused price suppression. See 19 U.S.C. § 1673c(l)(1)(B). Indeed, U.S. Steel does not dispute that what caused price suppression in this case was a high volume of extremely low-priced imports. See Pl.'s Comments at 11. The Court agrees with Commerce that, here, price

---

[8]U.S. Steel also asserts that Commerce has not explained how it arrived at its allocation of price to volume limits, see Pl.'s Comments at 13-14, but U.S. Steel failed to raise this argument at the agency level. Because none of the recognized exceptions to the doctrine of exhaustion is applicable here, see FAG Kugelfischer Georg Schafer AG v. United States, 25 CIT __, __, 131 F. Supp. 2d 104, 113-114 (2001), U.S. Steel's argument is not appropriately before the court.

undercutting is a suitable proxy for price suppression "because price underselling is, in this case, the root cause of price suppression. By materially eliminating the cause of price suppression, the Department is preventing price suppression itself." Redetermination at 29.

U.S. Steel succeeds in demonstrating that Commerce's analysis may not always be appropriate, if applied generally across different factual scenarios, but fails to demonstrate that Commerce's analysis is inappropriate in this specific instance. Commerce explains in the Redetermination the connection between the facts it found regarding the causes and amounts of price suppression and the choices it made in the Agreement, namely, a moratorium followed by significant restrictions on the price and volume of Russian imports. In addition, "[t]he methodologies relied upon by Commerce in making its determinations are presumptively correct." Thai Pineapple Pub. Co. v. United States, 187 F.3d 1362, 1365 (Fed. Cir. 1999) (citing Fujitsu Gen. v. United States, 88 F.3d 1034, 1044 (Fed. Cir. 1996)), cert. denied, 529 U.S. 1097 (2000). While the use of econometric modeling or other methods to determine how domestic producers will respond to a certain amount of imports at a certain price may also be appropriate, this Court cannot find that the method Commerce uses, which analyzes historical data to determine how to effectively

control the impact of future imports on domestic producers, is inappropriate in this case.

The remainder of U.S. Steel's arguments are also unpersuasive. Commerce's analysis is "backward-looking" only to the extent that it relies on historical data to provide a basis for setting price and volume limits at a level that will prevent significant price suppression in the future.  And, to the extent that Commerce fails to predict the future accurately, there are adjustment mechanisms built into the Agreement, as well as statutory provisions for administrative review, see 19 U.S.C. § 1675(a)(1)(c), and for termination of subsection (l) suspension agreements that fail to prevent suppression or undercutting of domestic producer prices, see 19 U.S.C. § 1673c(l)(2).

Lastly, in U.S. Steel I, the Court did not require Commerce on remand to issue generally applicable regulations or guidelines in support of the analysis used in the Agreement; rather, the Court asked Commerce to demonstrate that it "exercised reasoned discretion in arriving at the conclusion that the Agreement prevents price suppression or undercutting."  24 CIT at __, 123 F. Supp. 2d at 1371.  There is no post hoc rationalization problem where the agency re-examines its conclusion on remand, and, though arriving at the same conclusion, explains the conclusion in a reasoned way as guided by the facts of the case and its reasonable interpretation of the statute.  See Mitsubishi Heavy Industries,

<u>Ltd. v. United States</u>, 24 CIT __, __, 97 F. Supp. 2d 1203, 1209 n.9 (2000).

## Conclusion

Commerce's Redetermination is supported by substantial evidence and is otherwise in accordance with the law, and is therefore affirmed in all respects.

_____

Donald C. Pogue
Judge

Dated:    August 29, 2001
          New York, New York

**ERRATUM**

Slip Op. 01-110, issued August 29, 2001

*U.S. Steel Group, a Unit of USX Corporation, et al. v. United States*

The following party should be added to the caption and included in the listing of law firms and attorneys:

JSC Severstal, Defendant-Intervenor

<u>Powell, Goldstein, Frazer & Murphy LLP</u> (<u>Neil R. Ellis</u>), for Defendant-Intervenor

October 11, 2001